## No. 15,620.

### ELLIS *v*. THE PEOPLE.
(164 P. [2d] 733)

Decided December 10, 1945.

Mr. CHARLES J. MOYNIHAN, Mr. DAN H. HUGHES, Mr. EDWARD M. SHERMAN, Mr. C. E. SYDNER, for plaintiff in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Mr. Jack L. Graham, Assistant, for the people.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

Defendant was charged as accessory and convicted thereunder of murder of the second degree.

The evidence shows that at about eight-thirty o'clock on the evening of January 11, 1944, a young man appeared at the door of the home of Prowers Hudnall in Las Animas, Colorado, with a handkerchief tied over his face, a gun in one hand and a knife covered with a handkerchief in the other. He said it was a holdup and that he wanted one hundred dollars. When Hudnall handed over his wallet he grabbed for the gun and, while the two men struggled, his wife ran for help. When she returned she found her husband dying of knife wounds, and a trail of blood marking the assailant's flight. She gave sufficient description so that the identity of the assailant was quickly determined and about midnight he was picked up at his room and placed under arrest. When found, he had a severe cut across the palm of his hand. This assailant was a seventeen-year-old boy named Lawrence Kennedy, who had lived in the vicinity of Las Animas since 1937 and had finished the eighth grade in school. He had been away through the summer following up harvest work and after his return, instead of living at the farm home of his parents, four miles south of Las Animas, he stayed in town with a cousin named Don Myers in a two-room apartment over an inn. Kennedy readily confessed the murder and at first insisted that no one else had any part in the perpetration of the crime; but two days later, after his father had visited him at the jail with the sheriff, he changed his story and implicated de-

fendant, whose divorced wife was a cousin of Kennedy's mother. Defendant was employed at the La Junta air base and lived alone in Las Animas after his wife had left him, taking the two children, about five months before.

The somewhat confused testimony of Kennedy, the confessed murderer, was that, beginning just before Christmas, at defendant's invitation, he visited several times at the latter's home. His last visit was on Monday night, the night before the murder, and on his next prior visit he had mentioned to defendant a knife that he had had his grandfather make for him to stick hogs "and stuff like that," and they then discussed holdups and buying a gun, and defendant said he should keep the knife because they couldn't get any shells for the gun which defendant recommended that he buy. On the night before the murder, when Kennedy last visited defendant, instead of going alone, he took with him a fourteen-year-old boy named David Bray with whom he was well acquainted and who had several times visited at Kennedy's room. Kennedy had worked about a year at the Fort where Bray lived, and Bray, when going to school in Las Animas, had worked at the pool hall across the street from the garage where Prowers Hudnall and his wife both worked. Kennedy spent considerable time at the pool hall. On the night of that last visit, Kennedy and defendant talked in the kitchen while Bray was in the dining room listening to the radio, defendant having "told him to scram, get in there and listen to the radio; him and I wanted to talk." They then talked about holdups and defendant suggested that they hold up two places in the country but first wanted to rob a place in town so that the officers would be busy there while they made the holdups out in the country. Kennedy showed the gun he had bought that day, and defendant said he should take both a knife and gun. "If they got the gun away from us or something, we would have to use it, of course, to protect

ourselves." Defendant would not tell Kennedy whose place in town was to be held up, although he named the two places in the country, but defendant drew "some pictures" and described the place so he would know where to go. He told Kennedy to go down Main Street to within one block of the camp ground, and to wait there on the corner until he came along in a car; then Kennedy was to go one block west, one block south, another one west and then to the second house from the corner. Defendant also "drew a picture of the porch and showed me how it was fixed," and said there was a Red Cross sign in the front door. The holdup was to be carried out the next night and defendant was to wait with his car parked on the opposite side of the street and just around the corner. Defendant told Kennedy that the two holdups out in the country ought to make them around "two grand," or two thousand dollars. Kennedy was to commit the crimes and defendant was to assist in his escape.

After the visit of Kennedy and Bray at defendant's house, according to Don Myer's testimony, Kennedy took Bray with him to his room where the two boys stayed overnight. Bray testified that he could not remember where he spent the night.

The next afternoon Kennedy went to his room at four o'clock and stayed there until seven in order to meet some "party" who was to bring him some shells for the pistol when the bus came in. The record is strangely silent as to who was to bring the shells and whether they were brought. He had testified previously that he already had one shell and testified a little later that at the time of the robbery the gun wasn't loaded. After seven o'clock he followed defendant's directions and saw his car pass the agreed corner and, upon arrival at the house to be held up, he again saw the car which was waiting at the agreed place. He recognized the Hudnall house by defendant's "picture" of the porch and the Red Cross sign in the front door. At one place

in the record he said he went in the house from the front door, but again he testified that the Red Cross sign was in the side window and that he went in on the left side. After the attempted holdup and murder he ran over "cater corner" across the street to make his escape in defendant's car and when he was within about six feet of the car defendant saw the blood on his hand and sped away at about sixty miles an hour without picking him up.

As corroborating Kennedy's testimony, an employee at the Hudnall filling station testified that on the evening before the murder, defendant purchased some oil at the station after they had locked up, and while witness and Mr. Hudnall were counting the day's receipts; that the money they were counting was on the "big desk," and witness gave defendant change for a five dollar bill out of a drawer in the safe, and not out of the day's receipts; that after receiving his change defendant smoked a cigarette and remained two or three minutes; that in his presence Mr. Hudnall asked witness how much money he thought there was "laid out on the table, counting up the day's receipts," and he told him over two hundred dollars; that at the end of the day the money was put in the safe. The people followed this testimony by introducing in evidence the tickets of the filling station for the tenth of January, all connected and showing each customer, including the defendant as the last one for the day; however, these tickets, instead of showing in the neighborhood of two hundred dollars, disclosed total cash receipts on that day of only $21.28. This apparent discrepancy was not explained or mentioned in the record, but is here emphasized by defendant's counsel. It may further be noted that nothing appears in the testimony as to the location of the Hudnall residence where the holdup occurred with reference to the filling station where defendant saw the money. The jury may have assumed the residence was connected with the station. However, a plat, apparently

put in the record after the trial and stipulated as being correct, shows that the two places were more than three blocks apart. Assuming that the murdered man was the owner of the filling station where he worked, and further assuming that the day's receipts in fact totaled over two hundred dollars, there still appears to be no relevancy in the testimony that defendant knew Hudnall had two hundred dollars in the safe at the garage, to connect him with a holdup that night at Hudnall's home three blocks away. It was both irrelevant and prejudicial, but was received without objection.

David Bray by his testimony corroborated the evidence as to the visit to defendant's home the night before the murder, and stated that he overheard only two bits of conversation: Something about "two grand" and "when a guy gets too smart for you." He did not see any pistol, but knew Kennedy had one "when he was going down there," and thought he showed it to defendant. As further corroboration, a neighbor testified that about eight-thirty o'clock on the evening of the murder she saw a parked car with the lights on, and all at once it went away "awful fast"; that the car was parked "right across from the Hudnall home, angling," and that she heard of the murder about twenty minutes afterwards. Upon interrogation by the court she testified that she did not see any person at or near the car when it was driven away. Kennedy had testified that he was within six feet of defendant's car at the time. The sheriff testified that Kennedy's knife and gun were found hidden "in some trash and stuff" in the hallway four or five feet from the room occupied by Kennedy and where he was arrested, while Kennedy had testified that he threw them away in disgust in the snow immediately after defendant drove away without him.

Dick Hudnall, the son of the murdered man and chief of police of Las Animas, testified that he was called to his father's home on the evening of the murder and

found him dying; that he obtained a description of the assailant from his mother, determined his identity from that and other information he had, and made the arrest of Kennedy; that Kennedy was bleeding profusely and that "there was a trail of blood from our home, in the snow, out across the street, and then on up the street. Where it went, I don't know. I didn't follow it, but I saw it." "Up the street" would apparently be in the opposite direction from where Kennedy said the car was located and to which he said he ran.

Richard Hoisington testified that he had become acquainted with defendant while he worked at the La Junta air base and found out that he played the guitar and that since witness played the violin he invited defendant to come down some evening "and we would try to get together on a little music"; that defendant called at his house on the night of the murder at about ten or fifteen minutes to nine o'clock; that defendant had his guitar in the car and they tried to play together, but did not have much success harmonizing, and that defendant appeared to him as if he was a little nervous. The only other rebuttal was in the nature of statements alleged by the officers to have been made by defendant after his arrest; one being that defendant said he ought to have had better sense than to take hold of Kennedy's gun because he knew they had his finger prints, and another that when he was first arrested he said he left home about eight or eight-ten on the evening of the murder to visit Hoisington, while at another time he said it was eight-thirty, the same time as stated in his testimony at the trial.

During the examination of Kennedy, without any prior reference to the opinion of the officers, the following testimony was received: "Q. But the officers, you say, insisted somebody else was in it? A. Yes. Q. They did that from the first, didn't they? A. Yes. Q. Did they tell you why they knew, from reconstructing this, that you had help? A. Well, no; not exactly. They said

that gun and knife could never have got up there just by themselves. Q. Lawrence, did they tell you that they knew you, and knew you were not smart enough to plan a job of this kind? A. Yes. The Court:- That last question and answer, Mr. Mabry, will be stricken out. Mr. Mabry: Very well, your Honor; I will withdraw it. It may be leading. The Court: The jury are instructed to disregard it. Mr. Mabry: Anyway, the officers thruout all of the examination, insisted there was somebody else with you? A. How was that? Q. The officers did at all times, as I understand from your testimony, insist that you had help in what you were doing, and pulling this holdup? A. Yes."

These questions were not only grossly improper and prejudicial; they were inexcusable. Even upon objection sustained or instruction to the jury to disregard such testimony, its harm is not cured, but here no objection was interposed.

■ A motion for change of venue was filed, but without supporting affidavits, and it was withdrawn before trial. At the trial no pertinent objections were made to testimony received or instructions given. Objection was made only to refusal of the trial court to give two tendered instructions concerning the testimony of an accomplice. One of these was virtually identical with the statement of the law as expressed in *Moynahan v. People,* 63 Colo. 433, 167 Pac. 1175. The instruction as given by the court charged "that a person accused of crime may be convicted upon the uncorroborated testimony of an accomplice, still, a jury should always act upon such testimony with great caution and care, and subject it to critical examination in the light of all the other evidence in the case." This instruction is not erroneous. *Wisdom v. People,* 11 Colo. 170, 17 Pac. 519. However, it is better practice to charge further, that such testimony must be clear and convincing and show guilt beyond a reasonable doubt, as we have repeatedly declared to be the law. *Hoffman v. People,* 72

Colo. 552, 212 Pac. 848; *Schechtel v. People,* 105 Colo. 513, 99 P. (2d) 968.

 On this review, counsel now representing defendant challenge the sufficiency of the evidence, as was done by counsel representing him at the trial by motion for a directed verdict. While the record as read on review may seem not to constitute a satisfactory assurance of guilt, yet there was substantial evidence to support a conviction, and in such circumstances a reviewing court should not reverse on that ground.

 Error is assigned also to the instructions of the court defining and charging as to murder of the second degree, in that there was no evidence on which a verdict of second degree murder could properly be returned. The evidence is clear and undisputed that Kennedy was guilty of first degree murder in that the homicide was committed in an attempt to perpetrate a robbery. If defendant did aid and abet Kennedy in his attempted felony, as charged in the information, he, also, was guilty of murder of the first degree (*Reagan v. People,* 49 Colo. 316, 112 Pac. 785), if not, he was innocent; therefore, defendant's conviction of murder of the second degree is not supported by the evidence. *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; *Ehrhardt v. People,* 51 Colo. 205, 117 Pac. 164. Had proper objection been made in the trial court to the giving of the instructions on second degree murder, conviction thereof could not be sustained. *Dickens v. People,* 67 Colo. 409, 186 Pac. 277. In the Dickens case the instruction on murder of the second degree was made over the protest and objection of the defendant, and he further requested an instruction requiring that the verdict be either guilty of first degree murder or not guilty. The court in that case said: "Mere failure to give such an instruction limiting the verdict of guilty of first degree murder or acquittal might, in the absence of a request therefor, not have been reversible error, * * *." Here, defendant having failed to object to the erroneous instruction, and

having failed to request a proper one, we shall not say that he is entitled to gamble on a more favorable verdict than that which he might otherwise have received and then, when such verdict is returned, have the option of having it set aside and calling for a new trial.

■■ Error is further now assigned to the court's instruction which reads as follows: "The defense interposed by the defendant in this case, is what is known in law as an alibi,—that is, that the defendant was at another and different place at the time of the commission of the crime charged in the information, and so far away and under such circumstances that he could not with ordinary exertion have reached the place where the crime was committed, so as to have participated in the commission thereof. If the jury believe from the evidence herein that the defendant was not present at the place of the alleged crime at the time of its commission, or if you have a reasonable doubt whether or not he was present at such time and place, then you should give the defendant the benefit of such doubt and find him not guilty." No other instruction was given with regard to the defense and the plain inference from this instruction is that the entire defense rested upon successful establishment of alibi. In fact, defendant's entire defense was a denial of the testimony of the murderer as to his connection with the crime. No attempt was made to set up an alibi. Defendant offered no evidence tending to suggest that he could not, with ordinary exertion, have reached the place where the crime was committed, and on the other hand the prosecution offered no evidence that he was actually present. So the instruction was doubly inappropriate and misleading. If the jury followed the plain inference of the instruction that the sole defense was an alibi, then its first sentence required of the jury a verdict of guilty, because no alibi was established. Its second sentence positively required of the jury a verdict of not guilty, because defendant was not present at the time and

place of the murder. No instruction was given as to constructive presence.

■ By another instruction, not mentioned by counsel, the jury was charged, "In order to justify you in finding the defendant guilty of murder in the first degree you must find from the evidence adduced herein beyond all reasonable doubt, that the defendant deliberately and premeditatedly killed the deceased." There was no suggestion or contention that defendant killed the deceased and obedience to this instruction would have made acquittal mandatory.

■ It may be urged that these instructions on the whole were favorable to defendant, but where a jury is charged by one instruction that if they are satisfied of guilt they may convict, and by another that if they believe certain undisputed facts they should acquit, and by still another that in order to convict they must find as true, matters which are admittedly untrue, the inevitable result is confusion and bewilderment. *Magwire v. People,* 77 Colo. 149, 235 Pac. 339. Under such instructions it is not surprising that the jury returned a verdict of guilty of a degree of homicide not supported either by the evidence or by the instructions.

■ ■ It is the duty of the trial court to instruct the jury so plainly and accurately on the law of the case that they may comprehend the principles involved. Under our practice it is equally the duty of counsel to assist the court by objection to erroneous instructions, and by tender of instructions covering matters omitted by the court, and on failure of counsel therein, error assigned to the giving, or failure to give, pertinent instructions will not be considered on review except where the error is so serious and fundamental as to be patently prejudicial, and justice requires such consideration. *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71.

■ ■ Finally, error is urged in the denial of defendant's motion for new trial based upon the ground of prejudice and passion. No objection was made on

that ground during the trial and no continuation was sought and no affidavits are now submitted in support of this contention. Prejudice and passion are intangible matters of hostile atmosphere in the court room, of emotional tension among the spectators or personnel of the court, of community prejudgment and wrath directed against the defendant personally rather than against the crime itself, or of other conditions which destroy the "atmosphere of fairness and judicial calm which," as was said by Mr. Justice Goudy in *Emerick v. People,* 110 Colo. 572, 136 P: (2d) 668, "is essential to the preservation of the fundamental rights of those who are on trial in the courts of America, no matter of what they may be accused, nor how much their acts may shock the minds of trial judges and prosecutors." These are matters which readily become apparent to the trial judge, but can seldom be caught and preserved in the written record of the case. Accordingly, a motion based on such grounds must peculiarly be addressed to the discretion of the trial court, and its ruling thereon is not reviewable except in case of clear abuse of such discretion. So here, if the court, in the full exercise of its discretion, denied this motion, we are bound thereby; but was this the case? In overruling the motion, the trial court said that if a motion for change of venue had been presented to the court, it would have received serious consideration, and then, with reference to the contention that the verdict of the jury was the result of passion and prejudice, stated: "Now, this very same question came up in one of the most famous criminal trials in the history of this country, which was the case of the People vs. Durrant, arising in California: In that case, there was no motion for a change of venue, the same as in this case. The case went to the Supreme Court of California. They affirmed the verdict, on the ground that as there was no showing made that the personnel of the jury was prejudiced, they would affirm the verdict. But Justice McFarland said that it was a

matter of regret that Durrant was tried in an atmosphere as hostile as that in which he was tried. And I am frank to say, that the Court takes identically the same view here, as Justice McFarland took in· that case: It is a matter of regret the defendant was tried in the atmosphere he was. However, the Court is con·cluded now by the record, and the motion for a new trial will be overruled. Exception allowed to the defendant." Justice McFarland, however, who stated in his concurring opinion (*People v. Durrant,* 116 Cal. 179, 48 Pac. 75,) that, "as the case stands it is somewhat difficult to feel sufficiently assured· that outside adverse pressure did not have some insensible influence," was not the trial judge but a member of the reviewing court, and after making the statement of uncertainty above quoted, he further said: "But, whether or not appellant had a substantially fair trial, notwithstanding circumstances which certainly made it difficult for him to have such a trial, is a question which addressed itself, in the first instance, to the presiding judge of the trial court; and it is not so apparent that he abused his discretion in determining that question in the affirmative, as to give this court warrant to reverse the order denying a new trial." It is not the trial court, but the appellate court which is concluded by the record, unless abuse of discretion is apparent. The trial judge instead of being concluded by the record is challenged by it, as a responsibility from which he .cannot escape, to determine whether or not, in considering all the elements of the trial, the defendant has been given a fair and impartial hearing. When confronted with that responsibility the trial judge here expressed regret at the atmosphere in which the defendant was tried but held himself concluded by the record. As was said in *State v. Evans,* 98 Ore. 214, 192 Pac. 1062, "The learned trial judge abused his discretion by abjuring it. * * * Instead of assuming that discretion, he was misled by the precedents cited into denying it; * * *." This was error.

We do not determine whether, in the absence of proper record and objection, any one of the errors noted in this trial would have been sufficient in itself to justify reversal, but considering together the substantially uncorroborated and somewhat improbable story of the murderer, upon which the conviction was based, the prejudicial conduct of the prosecuting attorney, the inconsistency and confusion of the instructions, and the unsupported verdict, all climaxed by the trial court's expression of regret at the hostile atmosphere in which the defendant was tried and of its inability to grant a new trial, we are brought to the unavoidable conclusion that the defendant did not have the fair and impartial trial to which the law entitles him.

Accordingly, the judgment is reversed.