**Donald W. BIEBER, Petitioner and Cross–Respondent,**

v.

**The PEOPLE of The State of Colorado, Respondent and Cross–Petitioner.**

No. 92SC220.

Supreme Court of Colorado, En Banc.

July 19, 1993.

Rehearing Denied Aug. 23, 1993.

Vitek & Doniger, P.C., Anne M. Vitek, Jeffrey D. Doniger, Denver, for petitioner and cross-respondent.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Paul Koehler, Asst. Atty. Gen., Crim. Enforcement Section, Denver, for respondent and cross-petitioner.

Justice MULLARKEY delivered the Opinion of the Court.

Defendant Donald W. Bieber appeals his convictions for first-degree murder, aggravated robbery and second-degree aggravated motor vehicle theft on the grounds that the trial court erred in denying his request for a jury instruction on the defense of settled insanity. The three-member panel of the court of appeals issued three sepa-

rate opinions in the case—one dispositive, one concurring and one dissenting—revolving around the question of whether settled insanity is a tenable defense under our statutory scheme and case law. *People v. Bieber*, 835 P.2d 542 (Colo.App.1992). We granted certiorari in order to resolve the evident conflict. Finding that the defense of settled insanity is precluded by our statute, we affirm the dispositive judgment of the court of appeals.

### I.

The following facts are undisputed. On September 25, 1986, around 4:30 a.m., Bieber walked up to a truck in which William Ellis was sitting and shot Ellis in the back of his head. After opening the truck's door and allowing Ellis' body to fall onto the ground, Bieber proceeded to get into the truck and drive away. Bieber did not know Ellis.

For several hours prior and subsequent to the murder, Bieber had come into contact with various individuals at different locations. In addition to singing "God Bless America" and the "Marine Hymn," he told these people that he was a prisoner of war and that he was being followed by communists. He also fired shots at some of the people, without injuring anyone, and aimed his gun toward others. After the murder, he told people that he had killed a communist on "War Memorial Highway." Ellis' body was found around 6:00 a.m. and Bieber was arrested at approximately 8:00 a.m. Tests conducted later that day revealed no trace of amphetamines in his body, but did indicate heavy long-term marihuana use.[1]

Bieber has a long history of drug abuse. He began using drugs as a teenager, including amphetamines. As an adult, his heavy drug-use continued, and his primary means of income was through the sale of illegal drugs. Several years before the homicide, Bieber voluntarily sought treatment for mental impairment arising out of his substance abuse. He entered the hospital stating that he was afraid that he might hurt someone. His drug psychosis apparently cleared rapidly, and he was released into a long-term drug treatment program.

As a result of the events of the morning of September 25, Bieber was charged with first-degree murder after deliberation, felony murder, two counts of aggravated robbery and aggravated motor vehicle theft.[2] He pled not guilty by reason of insanity. § 16–8–103, 8A C.R.S. (1986). At his sanity trial, pursuant to section 16–8–104, 8A C.R.S. (1986),[3] Bieber argued that due to a variety of causes, particularly his long-term drug use, he was not intoxicated at the time of the murder, but rather legally insane.

Bieber contended that he was suffering from "amphetamine delusional disorder," ("ADD") which was described by his expert witness in the following manner:

A delusional disorder is a mental disorder which is characterized by delusional beliefs. A delusional belief is a belief held by an individual that is out of character for their sociocultural economic background and is held in a very rigid way and the person doesn't change their belief in the face of reasoning.

And it's a false belief. That is what a delusion is. There's a number of causes of delusional thinking. One cause of delusional thinking is what used to be called amphetamine psychosis. It's now called amphetamine delusional disorder.

And what that is from, some people when they use amphetamines on a chronic basis, begin to get very paranoid and delusional. And if that happens, it's as-

---

**1.** The prosecution notes that amphetamines pass through the body within two to five days. It contends that Bieber could have been under the influence of amphetamines at the time of the homicide, but the drug then passed out of his system before the urinalysis was done.

**2.** §§ 18–3–102(1)(a), 18–3–102(1)(b), 18–4–302, and 18–4–409, 8B C.R.S. (1986), respectively.

**3.** Under our statutory scheme, the issue of the defendant's sanity is addressed in a proceeding separate from the trial on the defendant's guilt, with different juries. § 16–8–104, 8A C.R.S. (1986).

sociated with the use of amphetamines. It's called an amphetamine delusional disorder.

According to the *Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association* (3rd Rev.Ed.1987) ("DSM–III"), one of the criteria for diagnosing ADD is the recent use of amphetamines during a period of long-term use of moderate to high doses of amphetamines or like drugs. The disorder abates over time, usually within a few days or weeks. Because Bieber allegedly was suffering from ADD at the time of the homicide, he argued that he was unable to distinguish right from wrong at the time of the homicide.[4]

The prosecution's psychiatric expert conceded that it was possible that Bieber could have been suffering from ADD at the time. His opinion, however, was that Bieber actually suffered from an anti-social personality disorder, which did not prevent him from knowing right from wrong at the time that he shot Ellis.

Based on his plea of insanity and its alleged cause of prolonged drug use, Bieber proffered the following jury instruction:

Insanity produced by long-continued use of amphetamines affects responsibility in the same way as insanity produced by any other cause if the mental disease or defect causing the insanity is "settled".

"Settled" does not mean permanent or incurable, but means that the mental disease or defect resulting in insanity exists independently of the contemporaneous use of the drug. One who is actually insane does not lose the defense of insanity simply because, at the time he committed the act in question, he may also have been intoxicated. It is immaterial that the use of amphetamines may have caused the insanity, as long as the insanity was of a settled nature and qualifies

as insanity as defined in Instruction No. ___.

This instruction was rejected by the trial court. Instead, the trial court instructed the jury in accordance with the legal test for insanity set forth in section 16–8–101, 8A C.R.S. (1986), which states in relevant part:

A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.

The trial court also instructed the jury that, "Intoxication does not, in itself, constitute a mental disease or defect within the meaning of a plea of not guilty by reason of insanity." The jury found Bieber to be sane.

In the guilt phase of the proceedings against Bieber, the jury found him guilty of felony murder, aggravated robbery and aggravated motor vehicle theft. Bieber was sentenced to life imprisonment on the felony murder and aggravated robbery convictions, and sentenced to six months, to be served concurrently, for the aggravated motor vehicle theft conviction. Bieber appealed to the court of appeals, contending that the trial court wrongly refused to give an instruction on "settled insanity." The court of appeals affirmed his convictions in a three-way opinion, and we agree with the dispositive judgment of that court, finding that our statutory scheme does not recognize "settled insanity" as a defense.

## II.

■ Before reaching the merits of the "settled insanity" issue, we first address a

---

**4.** This ability to distinguish right from wrong because of a mental disease or defect is the focus of the *M'Naghten* test for insanity. *See M'Naghten Case*, 1 C. & K. 130, 10 Cl. & F. 200,

8 Eng.Rep. 718 (1843). Colorado adopted the *M'Naghten* test in 1983 as part of its amended criminal code. § 16–8–101, 8A C.R.S. (1986).

preliminary matter. The prosecution, as one of its arguments, contends that Bieber abandoned his jury instruction claim at trial. Although the trial court informed defense counsel that it could argue settled insanity to the jury and present a theory of the defense instruction on that point, defense counsel did neither. In addition, defense counsel did not object to the prosecution's statement that Bieber could not claim that he was insane due to his drug abuse. These actions, or lack thereof, argues the prosecution, evidence Bieber's abandonment of the "settled insanity" defense.

Upon examination of the record, we do not agree with the prosecution's abandonment theory. The trial court ruled that it would not give an instruction on "settled insanity" per se, but would allow argument that Bieber's use of amphetamines may have contributed to his mental condition at the time of the homicide. Defense counsel stated on the record that he would not be arguing settled insanity in closing because of the trial court's ruling, and the trial court did not make any correction of defense counsel's belief, if indeed it were needed. Having made that statement on the record, defense counsel preserved the "settled insanity" issue for appeal, and we find the prosecution's abandonment argument to be without basis. Thus, we now turn to the merits of the "settled insanity" issue.

### III.

■ The doctrine of "settled insanity" has not been addressed previously in this state. However, this doctrine is one that may be traced back to English law of the early 19th century. Hale, Pleas of the Crown, Ch. IV. It was first recognized in federal court in the United States in *United States v. McGlue*, 26 Fed.Cas. 1093 (C.C.Mass.1851). It was accepted in state courts even earlier. *See, e.g., Haile v. State*, 30 Tenn. 154 (1850). We note, however, that these cases are not part of our common law. The General Assembly adopted the common law of England as of A.D. 1607 as the common law of our state. § 2–4–211, 1B C.R.S. (1980). Thus, subsequent action by English courts as well as courts of other jurisdictions in the United States may have persuasive value but has no precedential value for our interpretation.

■ The doctrine of "settled insanity" draws a distinction between voluntary intoxication, universally recognized as not constituting a defense, and "insanity" arising from the long-term use of intoxicants but separate from immediate intoxication. The reasoning behind this distinction has been set forth in many jurisdictions. For example, in *People v. Lim Dum Dong*, 26 Cal.App.2d 135, 78 P.2d 1026, 1028 (1938), the court stated as follows:

> There is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow men, and to society, to say nothing of more solemn obligations, to preserve so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable, but if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society ... It must be "settled insanity", and not merely a temporary mental condition ... which will relieve one of the responsibility of his criminal act.[5]

■ We recognize that the substantial weight of precedent from other jurisdictions that have considered the "settled insanity" defense lies in acceptance of that doctrine. We find, however, that the "settled insanity" defense is not reconcilable with our statutory scheme and its underlying policy concerns.

■ Colorado does recognize the defense of insanity, as embodied in our criminal code, cited above. § 16–8–101. The doc-

---

**5.** *See also, e.g., Beasley v. State*, 50 Ala. 149 (1876); *Martin v. State*, 100 Ark. 189, 139 S.W. 1122 (1911); *Strickland v. State*, 137 Ga. 115, 72 S.E. 922 (1911).

trine of "settled insanity," while ostensibly falling under the insanity statute, also invokes the question of intoxication, since its cause is the prolonged use of intoxicants. The General Assembly has definitively addressed the issue of intoxication as a defense.

Section 18–1–804, 8B C.R.S. (1986) provides as follows:

(1) Intoxication of the accused is not a defense to a criminal charge, except as provided in subsection (3) of this section, but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged.

(2) Intoxication does not, in itself, constitute mental disease or defect within the meaning of section 18–1–802.

(3) A person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law.

(4) "Intoxication", as used in this section means a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.

(5) "Self-induced intoxication" means intoxication caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body, unless they were introduced pursuant to medical advice or under circumstances that would afford a defense to a charge of crime.

A straight-forward reading of the statute indicates that "settled insanity" cannot be maintained as a defense. In subsection (4), "intoxication" is defined as "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." Bieber's condition falls directly into this definition—his alleged "settled in-

sanity" resulted from his use of amphetamines and, as such, may be regarded as an "intoxication." Such intoxication was "self-induced" under subsection (5), since Bieber knew of the effect that the drugs, which he took voluntarily, would have and were having on his body and mind. This point is evidenced in particular by Bieber's earlier drug treatment, which he sought because he was afraid that he would hurt someone.

We do not see any qualitative difference between a person who drinks or takes drugs knowing that he or she will be momentarily "mentally defective" as an immediate result, and one who drinks or takes drugs knowing that he or she may be "mentally defective" as an eventual, long-term result. In both cases, the person is aware of the possible consequences of his or her actions. We do not believe that in the latter case, such knowledge should be excused simply because the resulting affliction is more severe.

Our research has disclosed a number of states with intoxication statutes similar enough to ours to be of relevance.[6] Ala. Code § 13A–3–2 (1982); Ark.Code Ann. § 5–2–207 (Michie 1987); Conn.Gen.Stat. § 53a–7 (1993); Haw.Rev.Stat. § 702–230 (1985); Me.Rev.Stat.Ann. tit. 17–A, § 37 (West 1983); N.J.Rev.Stat. § 2C:2–8 (1993); Tenn.Code Ann. § 39–11–503 (1991). Of these states, Connecticut, Hawaii and Maine have not yet addressed the "settled insanity" issue. The remaining states have found "settled insanity" to be a viable defense. It is important to note, however, that these states recognized the defense of "settled insanity" well before they enacted their present criminal codes. *See Beasley v. State,* 50 Ala. 149 (1876); *Byrd v. State,* 76 Ark. 286, 88 S.W. 974 (1905); *State v. White,* 27 N.J. 158, 142 A.2d 65 (1958); *Haile,* 30 Tenn. 154. For these latter states, by virtue of their settled caselaw, their interpretation of their statute was already moulded. We are not in such a position, but must approach our statute from its plain meaning.

**6.** The similarity in statutes is due to the fact that they are all based in part upon the Model Penal Code, first promulgated by the American Law Institute in 1961.

■ Furthermore, underlying the intoxication statute, we have found strong policy concerns not necessarily addressed by these other jurisdictions. In *People v. DelGuidice*, 199 Colo. 41, 46, 606 P.2d 840, 844 (1980), we stated that:

The Colorado common law and statutory rule which makes evidence of voluntary intoxication incompetent to disprove general intent when that mental state is an element of a criminal charge is supported by weighty policy choices about the extent to which drunkenness can excuse criminal responsibility.

We addressed those policy choices more specifically in *Hendershott v. People*, 653 P.2d 385, 396 (Colo.1982), as follows:

The concept of self-induced intoxication, by definition, requires that the defendant be aware at the outset that the substance he is about to ingest may affect his mental faculties. It is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user. Also, because the intoxication must be "self-induced," the defendant necessarily must have had the conscious ability to prevent this temporary incapacity from coming into being at all. *Self-induced intoxication, therefore, by its very nature involves a degree of moral culpability. The moral blameworthiness lies in the voluntary impairment of one's mental faculties with knowledge that the resulting condition is a source of potential danger to others* .... It is this blameworthiness that serves as the basis for *DelGuidice*'s rule of exclusion. Thus, when a defendant chooses to knowingly introduce intoxicants into his body to the point of becoming temporarily impaired in his powers of perception, judgment and control, the policy enunciated in *DelGuidice* prohibits him from utilizing his intoxication as a defense to crimes requiring the *mens rea* of "knowingly," "willfully," "recklessly" or "with criminal negligence." There is nothing in *DelGuidice*, however, that is inconsistent with permitting a defendant to contest these culpability elements by evidence of a mental impairment caused by a known mental disease or defect, or by other evidence of an incapacity not caused directly by self-induced intoxication. (Citation and footnotes omitted) (emphasis added).

As a matter of public policy, therefore, we cannot excuse a defendant's actions, which endanger others in his or her community, based upon a mental disturbance or illness that he or she actively and voluntarily contracted. There is no principled basis to distinguish between the short-term and long-term effects of voluntary intoxication by punishing the first and excusing the second. If anything, the moral blameworthiness would seem to be even greater with respect to the long-term effects of many, repeated instances of voluntary intoxication occurring over an extended period of time.

Another point we find to be important in our analysis is the fact that, as argued by defense counsel, this particular form of "settled insanity"—ADD—is similar to the condition of temporary insanity. According to one of the expert witnesses as well as the DSM–III, ADD lasts between a few days and several weeks. It is not a permanent disorder, and thus, even if it were considered to be "insanity," is not a permanent or even long-term insanity. We have previously addressed, in a succinct fashion, the defense of temporary insanity in this state. In *People v. Low*, 732 P.2d 622 (Colo.1987), we stated that:

Temporary insanity is not part of the statutory framework for resolving a defendant's nonresponsibility for a criminal act, and was not a proper ground for the trial court's entry of judgment of acquittal.

The General Assembly has so far chosen not to redress this gap in our criminal code, and we must assume that its inaction is purposeful. Because temporary insanity is not recognized as a valid defense in this state, it would be inconsistent and erroneous to permit "settled insanity," which embraces principles similar to those of temporary insanity, as a valid defense.

Bieber also argues that, because Colorado adopted its insanity statute from the Model Penal Code (MPC), the comments to the MPC should control our interpretation of the statute. One comment provides that:

> Under the Model Penal Code, as under existing law, it is immaterial that a mental disease excluding responsibility was caused by excessive drinking and in that sense attributable to the defendant. This disease, generally delirium tremens, is said to be "fixed" or "settled."

1 A.L.I. Model Penal Code and Commentaries § 2.08, p. 362 (1985). We do not find this argument to be convincing. In enacting our criminal code, the General Assembly did not adopt the MPC *in toto*. Rather, it chose some provisions and rejected others. It cannot be said with any certainty, therefore, that the comment has persuasive or binding value.

Thus we determine that the "settled insanity" doctrine conflicts with our present statutory scheme regarding insanity and self-induced intoxication. Naturally, the General Assembly, should it disagree with our interpretation, is free to adopt the "settled insanity" doctrine through new legislation. Without such action, however, we cannot recognize "settled insanity" as a valid defense. The judgment of the court of appeals is affirmed.

LOHR, J., dissents, and ERICKSON and KIRSHBAUM, JJ., join in the dissent.

Justice LOHR dissenting:

The majority upholds the judgment of conviction in this case based on its conclusion that "settled insanity" does not constitute a valid defense to a criminal charge because a recognition of that defense would conflict with statutory provisions that limit the use of intoxication as a defense, *see* § 18–1–804, 8B C.R.S. (1986), and would contravene its view of our public

policy. Maj. op. at 815–16. Not only do I disagree that by that statute the General Assembly has precluded settled insanity from constituting a defense but I believe that under the dictates of due process the trial court was constitutionally obligated to instruct the jury on that defense, as the defendant requested. Accordingly, and in agreement with many of the arguments presented by Judge Dubofsky in his dissent in *People v. Bieber*, 835 P.2d 542, 548–51 (Colo.App.1992) (Dubofsky, J., dissenting),[1] I dissent from the majority opinion and conclude in contrast that the defendant's convictions for first-degree murder, aggravated robbery, and second-degree aggravated motor vehicle theft should be reversed and that this case should be remanded for a new trial on the sanity issue.

A fundamental tenet of our system of justice is that a person may not be held criminally responsible for actions performed while insane. *See* § 18–1–802, 8B C.R.S. (1986); *Ingles v. People*, 92 Colo. 518, 522, 22 P.2d 1109, 1111 (1933). This is because at some point a person's mind may be so impaired by disease or defect that he is incapable of entertaining criminal intent. *See Ryan v. People*, 60 Colo. 425, 427, 153 P. 756, 759 (1915). The General Assembly has determined, however, and we have accordingly held, that although a person may become temporarily incapacitated by the use of alcohol or drugs, voluntary intoxication does not constitute an affirmative defense to a crime and may be used only to negate specific intent when that intent is an element of the crime charged. *See* § 18–1–804(1); *Hendershott v. People*, 653 P.2d 385, 396 (Colo.1982), *cert. denied*, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983); *People v. DelGuidice*, 199 Colo. 41, 45, 606 P.2d 840, 843 (1979). In the present case, the defendant did not contend that his conduct should be excused on the basis that he was intoxicated at the time he

---

**1.** In the Colorado Court of Appeals, two members of the three judge panel recognized settled insanity as a defense. That view is the basis of Judge Dubofsky's dissent. *Bieber*, 835 P.2d at 548–51 (Dubofsky, J., dissenting). Judge Tursi agreed that " 'settled insanity' can be a disease

or defect of mind within the [statutory] definition of insanity," but took the position that in the present case it was an evidentiary question fairly arguable to the jury under the instructions given. *Bieber*, 835 P.2d at 548 (Tursi, J., specially concurring).

committed the offenses. Rather, he asserted that he should not be held accountable for his actions because he was legally insane[2] at the time. Because he claimed that his insanity was the result of a long-continued use of amphetamines, the defendant requested an instruction to inform the jury that the cause of the condition was immaterial as long as the insanity was settled.[3]

The defendant's proffered instruction rests on a distinction between an intoxicated condition caused by the voluntary ingestion of alcohol or drugs at or near the time of an offense and a mental condition[4] that exists independent of current use and results from a previous long-term consumption of such substances. The California Supreme Court described this distinction and the rationale for affording it different legal consequences in *People v. Kelly*, 10 Cal.3d 565, 111 Cal.Rptr. 171, 178, 516 P.2d 875, 882 (1973), stating that in the former situation the "mental impairment does not extend beyond the period of intoxication," but in the latter, when long-term intoxication results in insanity,

> the mental disorder remains even after the effects of the drug or alcohol have worn off. The actor is "legally insane," and the traditional justifications for criminal punishment are inapplicable because

of his inability to conform ... to accepted social behavior.

The Maryland Court of Appeals has characterized the distinction as " 'one between the direct results of drinking, which are voluntarily sought after, and its remote and undesired consequences.' " *Porreca v. State*, 49 Md.App. 522, 433 A.2d 1204, 1207 (1981) (quoting *Parker v. State*, 7 Md.App. 167, 254 A.2d 381, 388 (1970)).

Thus, even though the direct and short-term consequence of the use of a drug or alcohol—the state of intoxication—will not provide an excuse for resultant conduct because the voluntary nature of the use of that substance to obtain its immediate effects supports holding that person responsible for his actions, when that use develops into a condition that meets the definition of insanity, our society has determined that there is no longer any justification for holding the person legally accountable. As stated by LaFave and Scott,

> [t]he defense of intoxication is quite different from the defense of insanity, yet excessive drinking may bring on actual insanity ...; in such a case, if a defendant does not know right from wrong (in a *M'Naghten* test jurisdiction), he is not guilty of a crime because of his otherwise criminal conduct.

**2.** Insanity is defined in § 16-8-101, 8A C.R.S. (1986), which states that

(1) The applicable test of insanity shall be, and the jury shall be so instructed: "A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.".

(2) The term "diseased or defective in mind", as used in subsection (1) of this section, does not refer to an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

**3.** The defendant proffered the following instruction:

Insanity produced by long-continued use of amphetamines affects responsibility in the

same way as insanity produced by any other cause if the mental disease or defect causing the insanity is "settled".

"Settled" does not mean permanent or incurable, but means that the mental disease or defect resulting in insanity exists independently of the contemporaneous use of the drug. One who is actually insane does not lose the defense of insanity simply because, at the time he committed the act in question, he may also have been intoxicated. It is immaterial that the use of amphetamines may have caused the insanity, as long as the insanity was of a settled nature and qualifies as insanity as defined in Instruction No. __.

**4.** For purposes of this dissent, my references to the defendant's mental condition are phrased in terms of the defense of insanity rather than of impaired mental condition, *see* § 16-8-102(2.7), -103.5, 8A C.R.S. (1986 & 1992 Supp.); § 18-1-803, 8B C.R.S. (1986), because the defendant pleaded not guilty by reason of insanity.

Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 410(g), at 395 (2d ed. 1986) (footnotes omitted).[5]

Although the majority recognizes this distinction in the case now before us, it declines to give it effect. In contrast to the majority's position, I believe that when a person suffers from an actual disease or defect of the mind, regardless of whether it is attributable to prior alcohol or drug use, so that he meets the legal definition of insanity, and when that condition exists independent of any intoxicated state, any limitations on the ability to assert intoxication as a defense are inapplicable. *See Kelly*, 111 Cal.Rptr. at 178, 516 P.2d at 882 (" '[S]ettled insanity produced by a long-continued intoxication, affects responsibility in the same way as insanity produced by any other cause.") (quoting *People v. Travers*, 88 Cal. 233, 26 P. 88, 91 (1891)).

The validity and significance of the distinction between settled insanity and the immediate and transient effects resulting from ingestion of alcohol or other drugs are underscored by the wealth of authority from other jurisdictions that recognize the doctrine of settled insanity as a defense. *See, e.g., Hooks v. State*, 534 So.2d 329, 352–53 (Ala.Crim.App.1987), *aff'd*, 534 So.2d 371 (Ala.1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989);[6] *O'Leary v. State*, 604 P.2d 1099, 1103 (Alaska 1979), *overruled on other grounds, Evans v. State*, 645 P.2d 155, 160 n. 11 (Alaska 1982); *People v. Kelly*, 111 Cal.Rptr. at 178–79, 516 P.2d at 882–83; *Cirack v. State*, 201 So.2d 706, 709 (Fla. 1967); *State v. Clokey*, 83 Idaho 322, 364 P.2d 159, 164 (1961); *People v. Free*, 94 Ill.2d 378, 69 Ill.Dec. 1, 14–15, 447 N.E.2d 218, 231–32, *cert. denied*, 464 U.S. 865, 104

S.Ct. 200, 78 L.Ed.2d 175 (1983); *State v. James*, 223 Kan. 107, 574 P.2d 181, 184–85 (1977); *Porreca v. State*, 49 Md.App. 522, 433 A.2d 1204, 1206–07 (1981); *Commonwealth v. Ricard*, 355 Mass. 509, 246 N.E.2d 433, 435–37 (1969); *People v. Caulley, III*, 197 Mich.App. 177, 494 N.W.2d 853, 858–59, 859 n. 3 (1992); *State v. Preston*, 673 S.W.2d 1, 8 (Mo.), *cert. denied sub nom. Preston v. Missouri*, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984); *Couch v. State*, 375 P.2d 978, 980 (Okla.Crim.1962); *State v. Hartfield*, 300 S.C. 469, 388 S.E.2d 802, 804 (1990); *Evilsizer v. State*, 487 S.W.2d 113, 116–17 (Tex. Crim.App.1972); *Arey v. Peyton*, 209 Va. 370, 164 S.E.2d 691, 695 (1968); *State v. Wicks*, 98 Wash.2d 620, 657 P.2d 781, 782 (1983).

The majority recognizes this "substantial weight of precedent," and presents no authority from any jurisdiction holding to the contrary. However, it declines to accept the settled insanity defense in Colorado on the basis that the doctrine is not reconcilable with the statutory scheme established by the General Assembly. Maj. op. at 815–16. Specifically, the majority points to the statutory limitations on the use of intoxication as a defense to criminal charges contained in section 18–1–804, and states that because "[the defendant's] alleged 'settled insanity' resulted from his use of amphetamines, [it] may be regarded as an 'intoxication' " under subsection (4) of that statute. *Id.* at 816. It then attempts to buttress its position by focusing on the voluntary nature of the defendant's prior drug consumption and, contrary to the reasoning underlying the cases cited in the immediately preceding paragraph of this dissent, "[does] not see any qualitative difference between a person who drinks or

---

**5.** One writer has suggested that the appropriate distinction should be "between the alcoholic psychoses, which though they may be of a temporary nature are characterized by their indirect and gradual onset, and other mental effects of alcohol which are the psychic and somatic results of a single occasion of alcoholic ingestion." Note, *Intoxication as a Criminal Defense*, 55 *Colum.L.Rev.* 1210, 1220–21 (1955).

Although I see no need to define specifically the type of conditions that may constitute set-

tled insanity and believe that the only relevant question is whether a person meets the test set forth in § 16–8–101, I am satisfied that the distinctions between legal insanity and intoxication provide ample support for treating persons suffering from these conditions differently.

**6.** It is noteworthy that *Hooks* was decided in the context of an intoxication statute that even the majority believes is similar enough to § 18–1–804 to be of relevance to the construction of our statute. Maj. op. at 816.

takes drugs knowing that he or she will be momentarily 'mentally defective' as an immediate result, and one who drinks or takes drugs knowing that he or she may be 'mentally defective' as an eventual, long-term result." *Id.* at 816. Based on the individual's culpability in creating both conditions, it concludes as a matter of public policy that his actions ought not be excused. *Id.* at 816–17.

In contrast to the majority, I do not believe section 18–1–804 addresses the issue of settled insanity. The statute specifies that intoxication is not a defense to a criminal charge except as it may be relevant to negate specific intent. § 18–1–804(1). It also makes clear that intoxication "does not, in itself, constitute mental disease or defect within the meaning of section 18–1–802 [the statute providing that an insane person is absolved from criminal responsibility]." The critical question, therefore, is the meaning of "intoxication." That meaning is supplied by subsection (4) of section 18–1–804, as follows: " 'Intoxication', as used in the section means a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." The majority reads this definition to include a disease or defect of mind of a continuing nature produced as a consequence of long-term substance abuse. *See* maj. op. at 816. Contrary to the majority, I do not find this to be a "straight-forward reading of the statute," *see id.*, but rather, find the language more naturally descriptive of a condition that is an immediate or short-term and transient consequence of the introduction of any substance into the body. Even more importantly, the phrase "a disturbance of mental or physical capacities" resulting from introduction of a substance into the body, § 18–1–804(4), could not have been intended to comprehend the profoundly more serious mental condition necessary to meet the definition of insanity: "so diseased or defective in mind ... as to be incapable of distinguishing right from wrong with respect to [the act in question]." § 16–8–101(1). Furthermore, as earlier noted, the interpretation of section 18–1–804 as not addressing settled insanity is strengthened by the fact that an abundance of authority from other jurisdictions recognized settled insanity as a defense in 1971 when section 18–1–804 was most recently amended. *See* ch. 121, sec. 1, § 40–1–904, 1971 Colo.Sess. Laws 388, 412. Adding to this the apparent lack of authority holding to the contrary at that time, it is evident that if the legislature intended to embark on the lonely course attributed to it by the majority, its intent to do so would have been expressed with utmost clarity.

The majority also relies on *Hendershott v. People*, 653 P.2d at 396, as supporting the rejection of settled insanity as a defense. In *Hendershott*, we contrasted mental impairment in the form of adult minimal brain dysfunction and self-induced intoxication as those mental conditions relate to the ability of an accused to form the *mens rea* for a general intent crime. We held that admission of evidence of adult minimal brain dysfunction was mandated by principles of due process of law because "[s]uch a condition will generally result from unconscious processes beyond the actor's control." *Id.* at 396. In contrast, we determined that evidence of self-induced intoxication was not admissible because the resultant "disturbance of mental or physical capacities [is] caused by substances *knowingly* introduced into the body, which the defendant *knows or ought to know* have the tendency to cause the resulting disturbance." *Id.* (emphasis in original). The distinction, we held, was the basis for the legislative policy reflected in section 18–1–804, providing that self-induced intoxication is not a defense to a criminal charge. A close reading of *Hendershott*, however, makes clear that in discussing self-induced intoxication we were speaking not of a mental disease or impairment of the type described by the term "settled insanity" but of the short-term and transient disturbance closely following the ingestion of alcohol. This is made most clear in the following passage:

> [W]hen a defendant chooses to knowingly introduce intoxicants into his body to the point of becoming *temporarily* impaired in his powers of perception, judg-

ment and control, the policy enunciated in [*People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1949),] prohibits him from utilizing his intoxication as a defense to crimes requiring the *mens rea* of "knowingly," "willfully," "recklessly," or "with criminal negligence."

*Hendershott*, 653 P.2d at 396 (emphasis added). I view settled insanity as more closely analogous to the brain dysfunction condition in *Hendershott* than to self-induced intoxication and would distinguish on that basis the condition that the defendant has alleged in this case from the definition of intoxication contained in section 18–1–804(4).

Moreover, I also believe that the majority's reading of that statute implicates the constitutionally guaranteed right to due process of law, *U.S. Const.* amend. XIV, and *Colo. Const.* art. II, § 25, and could cause the statute to operate in a manner that denies persons this right. In *Hendershott*, 653 P.2d at 392–93, we determined that due process requires that defendants be allowed to present reliable and relevant evidence of mental impairment to negate the culpability element of general intent crimes. Although we recognized that the legislature maintains the prerogative both to denominate and to limit the affirmative defenses that criminal defendants can invoke, we made clear that it may not do so in a manner that impairs such persons' basic constitutional rights. *Id.* at 391. Thus, we refused to read the statutory provision that allows defendants to offer evidence of an impaired mental condition bearing on their capacity to form the intent required to commit a specific intent crime, *see* § 18–1–803, 8 C.R.S. (1973), as implying a limit on the right to present such evidence in defense of a general intent crime, as such a reading would have been constitutionally impermissible. *Hendershott*, 653 P.2d at 392, 392 n. 5. Similarly, a construction of section 18–1–804(1), (4) as precluding the assertion of settled insanity as an affirmative defense would bring that statute into conflict with the constitutional right of defendants enunciated in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), and *People v.*

*Cornelison*, 192 Colo. 337, 340–41, 559 P.2d 1102, 1105 (1977), to have the prosecution prove beyond a reasonable doubt every element of the crimes charged, including the existence of a voluntary act as required by section 18–1–502, 8B C.R.S. (1986), as well as any additional culpable mental state that the legislature may require. *See Hendershott*, 653 P.2d at 390. I therefore cannot accept the majority's view that a recognition of this defense is inconsistent with the statute and not justified by public policy.

The majority goes on to support its position by analogizing the particular form of settled insanity asserted in this case, amphetamine delusional disorder, to temporary insanity, which we have stated at least in passing is not a viable defense under our statutes. *People v. Low*, 732 P.2d 622, 632 (Colo.1987). Because evidence was presented that settled insanity is not a permanent condition, the majority concludes that it would be "erroneous" to find that it constitutes a valid defense. Maj. op. at 817. I disagree with this argument for the same reasons that Judge Dubofsky set forth in his dissent in the court of appeals. Not only is there no requirement in our statutory law that a person's insanity be permanent before it may be asserted as an affirmative defense, *see* §§ 16–8–101 to –107, 8A C.R.S. (1986 & 1992 Supp.), but such a requirement would undermine the assumption implicit in our statutory scheme that a person adjudged insane can be treated and at some point safely returned to society. *See People v. Gilliland*, 769 P.2d 477, 480–82 (Colo.1989) (discussing statutory requirements for a defendant's release from an insanity commitment). As Judge Dubofsky well stated, the proper focus is not on "the extent of the period of manifest insanity," but rather is on "when the drugs or alcohol were ingested in time relationship to the criminal offense." *Bieber*, 835 P.2d at 550. Consequently, I am not persuaded that any similarity between temporary insanity and the condition that the defendant in this case alleged requires preclusion of his assertion of settled insanity as a defense.

Having reached the conclusions that neither the statutory provisions governing intoxication nor the public policy concerns

raised by the majority justify its decision and that the distinction between insanity that results from a previous long-term drug or alcohol use and a short-term intoxicated condition that results immediately from consumption of these substances warrants recognition of settled insanity as a defense, the next consideration is the effect of the trial court's refusal to instruct the jury on this defense, as the defendant requested. A defendant is entitled to have the jury accurately instructed on the law as it relates to the evidence. *Ellis v. People,* 114 Colo. 334, 344–45, 164 P.2d 733, 737–38 (1945). A defendant is also entitled to a theory of the case instruction that states his defense if there is evidence to support his allegations. *People v. Marquez,* 692 P.2d 1089, 1098 (Colo.1984). Under these precepts, because the defendant's assertions would warrant an acquittal if the jury believed them to be true and if settled insanity were recognized as a defense, I would hold that the trial court erred in not instructing the jury on this doctrine. Considering the due process implications in this case, I conclude that this error requires reversal of the judgment of conviction and a new trial on the sanity issue in which the jury may be properly instructed. *See People v. Hardin,* 199 Colo. 229, 234, 607 P.2d 1291, 1294–95 (1980).

The majority today holds that a person who at the time of the commission of an act is incapable of distinguishing right from wrong with respect to that act as a result of a mental disease or defect brought about by substance abuse, even though that substance abuse was remote in time, is criminally responsible for that act. In doing so, the majority contravenes long established principles of criminal responsibility and charts a course contrary to all other jurisdictions that have addressed this issue. In my view the statute upon which the majority relies in no way requires this result. I dissent.

ERICKSON and KIRSHBAUM, JJ., join in this dissent.