The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Albert Peter GRENIER, Defendant–Appellant.

No. 00CA1992.

Colorado Court of Appeals, Div. III.

March 6, 2008.

Rehearing Denied May 22, 2008.

John W. Suthers, Attorney General, Katherine A. Hansen, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Ellen K. Eggleston, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge ROY.

Defendant, Albert Peter Grenier, appeals the judgment of conviction entered upon a jury verdict finding him guilty of first degree murder after deliberation, section 18–3–102(1)(a), C.R.S.2007, and abuse of a corpse, section 18–13–101, C.R.S.2007. We affirm.

On July 3, 1998, the victim's body was discovered under a bridge in Aurora, Colorado. The victim had been strangled, stabbed in the chest, and then sodomized following her death. On July 9, 1998, defendant was arrested in Florida for a traffic violation, and, upon a subsequent inventory search, the arresting officers found bloodstains and a bloodstained knife in the trunk of his vehicle. The arresting officers contacted Colorado authorities and subsequently questioned defendant concerning the victim's death.

During questioning, defendant initially denied involvement in the victim's death but later told the Florida authorities that he had picked up the victim, brought her to a hotel room, and had sex with her. Defendant further stated that following the sexual encounter, the victim tried to steal his wallet and during the resulting confrontation, he pushed her into a brick wall. Then, because the victim would not stop screaming, he first

grabbed her by the throat and then slammed her against the wall until she was unconscious. He indicated that after slamming the victim into the wall there was a lot of blood and that she was gasping for breath. Defendant said he then felt he should "finish her off" and stabbed her two to three times and, following her death, he had sex with her.

Defendant entered a plea of not guilty by reason of insanity pursuant to section 16–8–101, C.R.S.2007, and underwent court-ordered competency and sanity evaluations at the Colorado Mental Health Institute in Pueblo. Defendant was convicted as previously described and was sentenced to life in the Department of Corrections. This appeal followed.

## I.

Defendant asserts that a prospective juror should have been removed for cause. We disagree.

■ Appellate review of a trial court's ruling on a challenge for cause to a prospective juror applies an abuse of discretion standard. *Carrillo v. People*, 974 P.2d 478, 485 (Colo.1999). A trial court is not required to excuse a juror sua sponte. *People v. Coney*, 98 P.3d 930, 934 (Colo.App.2004).

Here, a prospective juror made statements indicating that he doubted his ability to be fair and impartial. Defendant challenged the juror for cause. The trial court declined to excuse him at that time and indicated that it would further question the juror along with several other jurors.

The next day, the court questioned the other challenged jurors on their ability to be fair and impartial. The court stated, "I'm satisfied that they can follow the Court's instructions, put aside preconceived ideas in regards to not pleading guilty by reason of insanity, and the Court is not going to excuse them for cause." The juror at issue here was not, however, further questioned. Defendant did not renew his challenge for cause but instead used a peremptory challenge to excuse the juror.

■ We conclude that defendant abandoned his challenge for cause by failing to request that the trial court grant or deny it before exercising a peremptory challenge to excuse the juror. *See People v. Cevallos–Acosta*, 140 P.3d 116, 122 (Colo.App.2005).

## II.

Defendant asserts that the trial court erred in denying his motions to suppress which challenged the legality of evidence obtained as a result of the traffic stop and his arrest, as well as statements he made to the police. We disagree.

■ When reviewing a trial court's denial of a motion to suppress, we defer to its findings of fact, but review its conclusions of law de novo. *People v. Garcia*, 11 P.3d 449, 453 (Colo.2000); *People v. Romero*, 953 P.2d 550, 555 (Colo.1998).

## A.

First, with regard to the legality of physical evidence obtained from defendant's vehicle by the two arresting officers, the officers observed the vehicle parked in violation of local ordinances in an area known for drug trafficking. After observing the vehicle pull away with an inoperable headlight, the officers stopped it. While behind the vehicle, both officers observed defendant reach his right hand over the rear of the front seat and drop a small black object. One officer asked defendant for his license, car registration, and insurance.

According to the officers, defendant appeared nervous, was sweating heavily, had shaking hands, and was breathing hard. When defendant opened his glove box, both officers observed a box of ammunition. One officer also observed a handgun on the floorboard where defendant had earlier dropped the black object. The officers arrested defendant for carrying a concealed firearm, placed him in the rear of a patrol car, advised him of his *Miranda* rights, and searched the passenger compartment of the vehicle incident to the arrest.

In their search, the officers initially smelled marijuana in the car and found a green pipe, which smelled like burnt marijuana. Based on the vehicle's location, and be-

cause there was no one to retrieve the car, the officers impounded the car and inventoried its contents, including the trunk, where one officer observed a knife with blood on it lying along the fender well. The other officer uncovered a gym bag containing ski masks, Mace, handcuffs, a baton, and other items. Both officers observed what appeared to be bloodstains inside the trunk.

### 1.

■ Defendant asserts that the initial stop was based on pretext because the officers saw him in front of a house known for drug-related activity, and, before stopping him, followed him for a number of blocks and ran a warrant check. At trial, an arresting officer testified that one of the reasons he stopped the car was to see if there was drug-related activity. These facts, without more, do not invalidate the initial stop.

■ The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution hold that the people shall be secure in their persons from unreasonable searches and seizures. A brief, investigatory stop does not violate this "reasonableness" standard where the stop is justified by a reasonable, articulable suspicion that the individual has or is engaged in criminal activity, and where the scope and character of the detention are reasonably related to its purpose. *People v. Johnson*, 865 P.2d 836, 838–39 (Colo.1994). Subjective intentions of an officer are irrelevant to a determination that he or she has reasonable suspicion to conduct an investigatory stop. *Whren v. United States*, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *People v. Cherry*, 119 P.3d 1081, 1083 (Colo.2005). Instead, specific, articulable facts and the rational inferences drawn from them are relevant to a reasonable suspicion of criminal activity. *Cherry*, 119 P.3d at 1083.

Here, in evaluating defendant's challenge to the reasonableness of the initial stop, the court found that both officers had seen defendant's car parked in violation of a local ordinance and then observed the car drive away with only one operating headlight. The court concluded that this "is a circumstance under which an officer is entitled to stop and investigate as to whether a driver is violating the law by operating a vehicle without the appropriate number of headlights or having parked in an illegal fashion, and the stop was therefore properly made."

We agree with the trial court and conclude that the arresting officers had a reasonable suspicion sufficient to support an investigatory traffic stop.

### 2.

■ Defendant next asserts that the arresting officers conducted an unconstitutional warrantless search of his car's trunk. We disagree.

■ An inventory search of a vehicle lawfully impounded by law enforcement officials is a recognized exception to the warrant requirement if the search is conducted pursuant to routine procedures. *People v. Gee*, 33 P.3d 1252, 1254 (Colo.App.2001). An inventory search of the contents of the vehicle may be made by an officer who has validly taken a vehicle into custody. *People v. Litchfield*, 918 P.2d 1099, 1105 (Colo.1996). A decision to impound a motor vehicle will be upheld as long as that decision has been made according to standard criteria in a department's regulations. *People v. Milligan*, 77 P.3d 771, 776 (Colo.App.2003).

The department's regulations state:

Deputies are authorized by Florida law to tow and impound vehicles and/or equipment and property when necessary to provide for the safety and/or security of such vehicles and/or equipment and property as follows:

. . . .

When the driver of a vehicle is taken into custody *all reasonable efforts* will be made to provide the vehicle driver with an alternative to towing the vehicle. The vehicle may be left unattended upon a public roadway, public parking lot, shopping center, etc., or upon the private property of a person other than the owner/operator of

the vehicle, providing permission to leave [the] vehicle is signed.

(Emphasis added.)

Here, an arresting officer testified that it was routine procedure that every time the sole occupant of a car is arrested, and there is no alternative person to take the car, the car is impounded. Both arresting officers testified that at the time defendant was taken into custody, there was no one else available to take the car. In addition, a supervisor testified that the car could not be left unattended because, considering the area of town, the car would likely not be there when defendant returned. Given these factors, we conclude that the decision to impound the vehicle was reasonable, in accordance with the applicable department regulations, and necessary to provide for the security of the car.

Given our conclusion, we need not address whether the search of defendant's trunk was also permissible under the automobile exception.

### B.

Next, defendant argues that his statements made to the Florida authorities on the evening of his arrest and the next day during audio-recorded custodial interrogations should have been suppressed.

The officers testified that the interview room was small; the officers were in plain clothes; defendant was advised of his *Miranda* rights, indicated that he understood his rights, did not ask questions, agreed to be interviewed, and then initialed and signed the waiver form. The officers also testified that no promises were made to defendant and he was never threatened. Defendant claimed to have gotten little sleep the night before, but appeared mentally coherent and alert. Defendant confessed during the second interrogation, which lasted somewhat less than four hours.

### 1.

■ Defendant asserts that his statements should have been suppressed because he did not validly waive his *Miranda* rights. We disagree.

■ Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before a person can be subjected to custodial interrogation by the police, he or she must be advised of the right to remain silent and the right to the presence of an attorney. These rights may be waived, as long as the waiver is voluntary, knowing, and intelligent. *Id.* at 444, 86 S.Ct. at 1612. The validity of the waiver involves a two-part inquiry: (1) the relinquishment of the rights must be voluntary; and (2) the waiver must be made with full awareness of the nature of the rights abandoned and the consequences of the decision to abandon those rights. *People v. Jordan*, 891 P.2d 1010, 1014 (Colo. 1995). The prosecution bears the burden of proving the waiver by a preponderance of the evidence. *Id.* When determining the validity of a waiver, the court must consider the totality of the circumstances surrounding the custodial interrogation. *Id.* at 1014–15.

■ Defendant asserts that his waiver of his *Miranda* rights was not voluntary, knowing, and intelligent because the advisement was read very quickly. However, the advising officer stopped after reading each line and asked whether defendant understood, to which he indicated that he did. Moreover, defendant had been advised of his *Miranda* rights the day before. Therefore, defendant's advisement was sufficient. *See People v. Harrison*, 58 P.3d 1103, 1107 (Colo.App. 2002).

In addition, defendant asserts that his ongoing severe mental health disabilities, history of drug addiction, and low-level intellectual range showed that he neither understood his rights nor appreciated the consequences of waiving them. However, despite defendant's alleged disabilities, he appeared to be mentally coherent and alert throughout the interview. The fact that defendant provided some illogical answers does not alter our analysis.

Therefore, given the totality of the circumstances, we conclude that defendant provided a valid waiver of his *Miranda* rights.

### 2.

Defendant next asserts that the trial court erroneously failed to suppress his statements

because he invoked his right to counsel. We disagree.

 If a suspect requests counsel at any time during the interview, further questioning must cease until a lawyer has been made available or the suspect himself or herself reinitiates conversation. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). However, this request for counsel must be clear, unequivocal, and unambiguous. If a suspect requests an attorney in a manner that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, questioning need not cease. Whether or not a suspect invoked his or her right to counsel is an objective inquiry. *Davis v. United States,* 512 U.S. 452, 458–59, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994).

 Defendant asserts that his statement, "maybe I should get a lawyer or what ever find out where I stand," invoked his right to an attorney. However, this request is ambiguous and does not necessitate the cessation of questioning. *See Davis,* 512 U.S. at 462, 114 S.Ct. at 2357 ("Maybe I should talk to a lawyer" was not a sufficient request for counsel).

In addition, the following extended exchange occurred:

Officer: If somebody is setting you up, it's time, time to tell us if somebody set you up, time to tell us, don't cover for somebody, don't let yourself get into trouble.

Defendant: The truth is, *I don't want to say the truth without a lawyer or something,* to talk about this, the truth is my trunk does open and I don't want to say anything ah, ah, after I haven't admitted to doing this, I am not gonna admit to doing this, I did not do this.

Officer: You said a minute ago you wanted to represent yourself, that's why . . .

Defendant: Yeah.

Officer: Okay.

Defendant: I know what happened and I, I don't think telling, you are in Florida, I want to go to a court of law and do it and

say the real truth cause I ain't saying in here, I know what the real truth is.

Officer: Okay, well I do too, to a point.

Defendant: The real truth is I did not stab this woman and kill this woman.

Officer: Somebody else did and you're, I don't want you to get in trouble if you are trying to cover for somebody.

Defendant: I am not covering for anybody, I uh . . .

Officer: Well we know what happened to her, we know what happened to her right?

Defendant: No, I ain't heard, stabbed and uh . . .

Officer: Okay.

Defendant: Ah, Hispanic woman.

Officer: Okay well, you know your [inaudible] . . .

Defendant: Nobody is going to buy the truth that's why I want to . . .

Officer: We are never going to know, we are never going to know.

Defendant: *I don't want to say the truth cause it's not a court of law and I don't have an attorney.*

Officer: But you said you wanted to represent yourself?

Defendant: Well, yeah, this ain't a court of law.

Officer: Okay.

Defendant: I have already been incriminated with blood and the knife's bit, I am not going to say a hundred percent, do, uh, well. . . .

(Emphasis added.)

 The statements "I don't want to say the truth without a lawyer or something" and "I don't want to say the truth cause it's not a court of law and I don't have an attorney" are not unambiguous requests for an attorney. Rather, when viewed in context, they demonstrate that defendant was merely hesitant about telling the truth during the questioning.

Therefore, we conclude that defendant did not clearly, unambiguously, and unequivocally invoke his right to an attorney.

### 3.

Defendant asserts that the trial court erroneously failed to suppress his statements because he invoked his right to remain silent. We disagree.

Once a criminal suspect invokes his or her right to remain silent, the police must honor the assertion of this right and the interrogators must " 'counteract[ ] the coercive pressures of the custodial setting' through steps such as ceasing the interrogation, allowing a significant amount of time to pass before resuming questioning, and reissuing the *Miranda* warnings." *People v. Arroya,* 988 P.2d 1124, 1130 (Colo.1999) (quoting *Michigan v. Mosley,* 423 U.S. 96, 104–05, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975)). A defendant's invocation of the right to remain silent must be clear and unequivocal. *People v. Gray,* 975 P.2d 1124, 1130 (Colo.App.1997).

> The following exchange occurred:
>
> Officer: Are we accusing you of something that I'm not aware of? We're having a conversation here and you of course read that you have the right to stop answering at any time.
>
> Defendant: Yeah, I know, I didn't start, I didn't start.
>
> Officer: Do you still wish to talk to us?
> Defendant: I guess I say I do.
> Officer: I'm sorry?
> Defendant: I don't know why there's blood in my car that matches somebody I haven't figured this out.

Defendant asserts that he replied, "I didn't say I did." The court agreed that defendant's statement could be interpreted either way. Therefore, defendant's statement is ambiguous. Given the inaudible quality of defendant's response, the officer sought to elicit a clear response. Defendant's subsequent answer indicates that he was not attempting to invoke his right to remain silent.

Therefore, we conclude that defendant did not clearly, unambiguously, and unequivocally invoke his right to remain silent.

Given our conclusions, we need not address defendant's remaining assertions that · the court's inevitable discovery ruling lacks legal support and that evidence procured by means of unconstitutional practices constitutes fruit of the poisonous tree that should have been suppressed.

### III.

Defendant asserts that the court improperly foreclosed him from offering evidence probative of settled insanity that, when considered with evidence of other mental conditions, would have established the affirmative defense of insanity. More particularly, defendant claims that the trial court erred in excluding the testimony of his psychiatrist who was apparently prepared to testify that defendant suffered from a polydrug abuse disorder and at the time of the offense, defendant was intoxicated on cocaine which exacerbated his multiple chronic mental illnesses, rendering him temporarily insane. We disagree with the assertion.

For crimes committed after July 1, 1995, the test for insanity is set forth in section 16–8–101.5(1), C.R.S.2007, as follows:

> (a) A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act ... or
>
> (b) A person who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged....

"Trial courts are necessarily accorded considerable discretion in deciding questions concerning the admissibility of evidence, and an abuse of that discretion will be found only upon a showing that the ruling was manifestly arbitrary, unreasonable, or unfair." *People v. Rath,* 44 P.3d 1033, 1043 (Colo.2002).

Prior to trial, the prosecution filed a motion in limine, citing *Bieber v. People,* 856 P.2d 811 (Colo.1993), requesting the court to prohibit evidence of "settled insanity" based on defendant's long-term drug use. "Settled insanity" is defined as " 'insanity' arising from the long-term use of intoxicants but

separate from immediate intoxication." *Id.* at 815.

The trial court ruled that settled insanity is not an available defense in Colorado and instructions on that defense are not allowed. However, the court stated that defendant was not foreclosed from introducing evidence that he "has some other condition that may have independent bearing on [his] ability . . . to form specific intent."

In *Bieber*, the defendant had not used drugs for at least two days prior to the commission of a homicide. *Id.* at 813. The defendant unsuccessfully claimed that the effects of prior drug use caused him to commit the crime, and he requested jury instructions on a "settled insanity" defense. *Id.* at 813–14. The *Bieber* court stated:

> We do not see any qualitative difference between a person who drinks or takes drugs knowing that he or she will be momentarily "mentally defective" as an immediate result, and one who drinks or takes drugs knowing that he or she may be "mentally defective" as an eventual, long-term result.

*Id.* at 816.

Moreover, in terms of moral blameworthiness, the court reasoned that "[t]here is no principled basis to distinguish between the short-term and long-term effects of voluntary intoxication by punishing the first and excusing the second." *Id.* at 817.

In *People v. Hill*, 934 P.2d 821 (Colo.1997) (*Hill III* ), the defendant, at his first sanity trial, called a psychiatrist who opined that the defendant was insane at the time of the offense because he suffered from cocaine delusional disorder which (1) is caused by long-term cocaine use; (2) has symptoms similar to paranoid schizophrenia; and (3) can remain months after the use of cocaine has ceased. *Id.* at 822. A verdict finding the defendant sane was reversed on appeal, and the matter was remanded for a new trial on the sanity issue. *People v. Hill*, (Colo.App. No. 90CA0466, July 23, 1992) (not published pursuant to C.A.R. 35(f) ) (*Hill I* ).

Just prior to the second trial, our supreme court announced *Bieber* and, based on that case, the defendant did not call the psychia-

trist at the second trial but, instead, relied on his own testimony concerning his "long-term drug abuse, loss of memory, compulsive behavior, delusions, lack of understanding of right and wrong, and feelings of depression and isolation." *People v. Hill*, 920 P.2d 828, 830 (Colo.App.1995) (*Hill II* ). The jury was instructed that no evidence of insanity had been presented by the defendant. The jury returned a verdict finding the defendant sane, and the division reversed. *Id.*

Our supreme court reversed and reinstated the verdict, stating, in part, that "[i]n *Bieber* we rejected the defense of settled insanity and approved a trial court's denial of an instruction on that defense, *but we did not address whether evidence probative of settled insanity is admissible to show insanity as defined by the General Assembly.*" *Hill III*, 934 P.2d at 824 (citation omitted, emphasis added). However, while the supreme court in *Hill III* posited a limitation on its holding in *Bieber*, it did not resolve the issue raised by the limitation, nor was resolution of that issue necessary to its holding in *Hill III*.

Nevertheless, defendant asserts, based on *Hill III*, that *Bieber* did not preclude evidence of the effects of his long-term drug use, when viewed together with evidence of his other mental illnesses. Defendant's psychiatrist wrote a report which suggested that defendant might have had "temporary insanity" at the time of the offense based on his mental illnesses combined with his cocaine intoxication. Specifically, the physician wrote, "as the defendant's arousal decreased, as it would as the cocaine wore off and sexual arousal and anger subsided, the defendant would re-compensate and appreciate the wrongfulness of his prior act." This evidence does not suggest settled insanity as it indicates that any "temporary insanity" was caused by the effects of being under the voluntary influence of cocaine. Moreover, it suggests that defendant was capable of understanding the wrongfulness of his act at the time of the killing but for the recent ingestion of cocaine.

The physician also hypothesized:

> Due to the gross cognitive-perceptual distortions symptomatic of individuals with Schizoaffective disorder and Borderline

Personality disorder, these severe mental disorders typically produce intermittent violent acting out. It is likely that the defendant would temporarily, not be able to distinguish right from wrong due to these mental illnesses, at the time of his alleged offenses, even if he had not been intoxicated by cocaine. This is explained by being psychotically mentally ill, while being concurrently sexually aroused and frustrated.

Given that defendant's psychiatrist did not opine that defendant's schizoaffective disorder and borderline personality disorder were induced by cocaine, we do not read the court's order as prohibiting testimony that schizoaffective disorder and borderline personality disorder could have rendered defendant incapable of distinguishing right from wrong in the absence of his being intoxicated on cocaine.

A psychiatrist called by the prosecution stated that "[r]ecords reviewed from the time period do suggest a significant impairment related to substance abuse, perhaps rising to the severity of schizophrenia." However, the phrase "from the time period" refers to 1981–82, not the time of the killing, and that impairment arose from a then current abuse of marijuana. The psychiatrist concluded that "[a]round the time of the offense, there is not consistent evidence that he was under the influence of a mental illness resulting in significantly impaired functioning" and that "the preponderance of the evidence suggested that he was not under any major psychotic mental state at the time of the offense, and he appeared to consistently appreciate the wrongfulness of this act."

A clinical psychologist testifying for the prosecution evaluated whether defendant met the statutory requirements for being legally competent to proceed. The psychologist concluded that while defendant has "a personality disorder, paraphilias, and a history of substance abuse ... [the psychologist did] not believe these factors substantially interfere with his ability to understand his legal situation, participate in his defense or work with his attorney."

■ While all the experts diagnosed defendant with substance abuse problems or disorders caused by his substance abuse,

none indicated that the effects of defendant's long-term drug use, when viewed together with evidence of his other mental illnesses, rendered him incapable of distinguishing right from wrong or that he lacked the capacity to participate in his own defense. Therefore, we need not address whether evidence of settled insanity, when considered with evidence of other mental conditions, would establish the affirmative defense of insanity.

Consequently, we conclude that the trial court did not abuse its discretion in excluding evidence probative of settled insanity.

## IV.

■ Defendant also asserts that the trial court erred in rejecting his request to assert involuntary intoxication as an affirmative defense. Specifically, defendant argues that "some credible evidence" exists to support the proposition that his illness affected his capacity to know and appreciate the long-term effects of intoxicants. We disagree.

■■ A defendant must present "some credible evidence" supporting the claimed affirmative defense to have the defense submitted to the jury. § 18–1–407(1), C.R.S.2007; *People v. Saavedra–Rodriguez*, 971 P.2d 223, 228 (Colo.1998). Whether the defendant has presented "some credible evidence" is a question of law for the trial court, which an appellate court reviews de novo. *Hill III*, 934 P.2d at 826. A trial court commits reversible error if it improperly disallows an affirmative defense because it has the effect of impermissibly lowering the prosecution's burden of proof. *Vega v. People*, 893 P.2d 107, 111 (Colo.1995); *see Lybarger v. People*, 807 P.2d 570, 581–83 (Colo.1991).

■ Involuntary intoxication is a legally separate and distinct defense from the defense of insanity. *People v. Garcia*, 113 P.3d 775, 782–83 (Colo.2005). Intoxication is defined as "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 18–1–804(4), C.R.S.2007. Voluntary, or self-induced, intoxication is caused by "substances which the defendant knows or ought to know have the

tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body." § 18–1–804(5), C.R.S. 2007.

 In contrast, involuntary intoxication is intoxication which is "not self-induced," *see* § 18–1–804(3), C.R.S.2007, and can occur when a person takes a substance pursuant to medical advice, does not know that he or she is ingesting an intoxicant, or ingests a substance which is not known to be an intoxicating substance. *People v. Low,* 732 P.2d 622, 627 (Colo.1987). Involuntary intoxication is a complete defense to all crimes. *Garcia,* 113 P.3d at 780.

 Here, defendant argues that evidence presented by one of the psychiatrists that defendant "ha[d] a chronic pattern of substance abuse, and met the diagnostic criteria for drug dependence," was sufficient to meet the criterion of being "some credible evidence" that his illness affected his capacity to know and appreciate the long-term effects of intoxicants. However, addiction is not sufficient to render drug use involuntary or unknowing so as to give rise to the defense of involuntary intoxication. *Tacorante v. People,* 624 P.2d 1324, 1327–28 (Colo.1981).

In addition, the psychiatrist did not state that defendant's mental illnesses affected his capacity to know and appreciate the long-term effects of the intoxicating substances. Rather, the physician concluded that "the preponderance of the evidence suggested that [defendant] was not under any major psychotic mental state at the time of the offense, and he appeared to consistently appreciate the wrongfulness of the act." Therefore, defendant's history of mental illnesses and drug abuse do not, without more, constitute "some credible evidence" that he did not possess the capacity to know and appreciate the long-term effects of intoxicants.

## V.

Defendant asserts that the trial court's rulings concerning the affirmative defense of insanity effectively removed the issue of sanity from the jury's consideration and reversed the burden of proof. We disagree.

 The applicable test of insanity is stated above in Section III of this opinion. § 16–8–101.5(1). "Every person is presumed to be sane; but, once any evidence of insanity is introduced, the people have the burden of proving sanity beyond a reasonable doubt." § 16–8–105.5(2), C.R.S.2007. This presumption operates to relieve the prosecution of introducing evidence of sanity until some evidence of insanity is introduced. *Hill III,* 934 P.2d at 824. Moreover, "[i]n Colorado, *any* evidence of insanity is legally sufficient to support an insanity defense and rebut the presumption of sanity." *Id.* at 830 (emphasis added).

### A.

Based on the court-ordered evaluation, two expert witnesses expressed their opinions during the prosecution's case-in-chief that defendant was sane at the time of the crime. Prior to the testimony, defendant requested that the court find that sufficient evidence had been admitted to raise the insanity defense and that the prosecution had the burden of proving his sanity beyond a reasonable doubt. The court refused both requests. Defendant asserts that this refusal impermissibly lowered the prosecution's burden of proof. We disagree.

 "[T]he threshold determination as to whether some credible evidence exists to support an affirmative defense is a matter of law for the [trial] court to decide." *Hill III,* 934 P.2d at 826. Then, the trial court is obliged to instruct the jury on the defense. *Lybarger,* 807 P.2d at 579. If the trial court errs in disallowing the defense of insanity, it improperly reduces the prosecution's burden of proof. *Vega,* 893 P.2d at 111.

 Here, it is undisputed that sufficient evidence had been admitted prior to the testimony of the expert witnesses to raise the issue of defendant's sanity. Therefore, the trial court correctly permitted the expert testimony. *See* § 16–8–104.5(1), C.R.S.2007.

 Before and after each expert's testimony and in the final jury instructions, the trial court gave the jury a limiting instruction that the expert testimony could be

considered only on the issue of defendant's sanity. While the trial court made no express finding as to the sufficiency of the evidence of insanity as requested by defendant, by giving the limiting instructions it implicitly made the requisite finding. We have neither been presented with, nor can we find, any authority requiring a trial court to make an explicit finding that the presumption of sanity has been rebutted and so instruct the jury.

The trial court is required in the final instructions to instruct the jury on an affirmative defense once the defense has been raised. *See, e.g., People v. Fuller*, 781 P.2d 647, 651 (Colo.1989) (self-defense). We have not been cited to, and have not found, authorities that require a trial court to instruct the jury in the course of the trial that sufficient evidence has been introduced to raise an affirmative defense or prior to the introduction of the prosecution's evidence seeking to refute the affirmative defense beyond a reasonable doubt.

In addition, even if there was error in failing to instruct the jury as requested by defendant during the prosecution's case-in-chief, the error would be harmless. Prior to voir dire, the prospective jurors were advised that the prosecution bore the burden of proving defendant's sanity beyond a reasonable doubt. Moreover, as will be discussed, the jury was adequately instructed in the final instructions as to the prosecution's burden of proof. Therefore, we conclude that the trial court's refusal of defendant's requests to make a specific finding on the prosecution's burden of proof and to immediately instruct the jury on it, did not impermissibly lower the prosecution's burden of proof.

### B.

Defendant asserts that the jury instructions did not adequately advise the jury regarding the prosecution's burden of proving his sanity. Specifically, he asserts that the instructions did not inform the jury that (1) it must determine whether the prosecution had satisfied its burden of proving defendant's sanity beyond a reasonable doubt; and (2) it must find defendant not guilty by reason of insanity if the prosecution failed to satisfy its burden of proving sanity beyond a reasonable doubt. We disagree.

Here, defendant objected to the pertinent jury instructions; therefore, the issue is preserved, and a harmless error standard applies. Under this standard, reversal is required unless the error does not affect substantial rights of the defendant. Crim. P. 52(a); *People v. Garcia*, 28 P.3d 340, 344 (Colo.2001).

The general burden of proof instruction stated that "[t]he burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all the elements necessary to constitute the crime charged." The culpable mental state instruction stated:

A crime is committed when the defendant has committed a voluntary act prohibited by law accompanied by a culpable mental state.... The culpable mental state is as much an element of the crime as the act itself and must be proven beyond a reasonable doubt, either by direct or circumstantial evidence.

The insanity instruction stated that "[i]nsanity is an affirmative defense to all of the crimes charged in this case, as well as any lesser offenses," and provided the applicable tests of insanity. The affirmative defense instruction stated, "The evidence presented in this case has raised an affirmative defense. The prosecution has the burden of proving the guilt of the defendant to your satisfaction beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged." All of the elemental instructions for the crimes charged stated that the prosecution must prove "each of the elements beyond a reasonable doubt," and further stated that the crime was committed "without the affirmative defense[ ]" of insanity.

These jury instructions, taken together, properly and adequately informed the jury that the prosecution had the burden of proving defendant's sanity beyond a reasonable doubt and that defendant was not guilty by reason of insanity if the prosecution failed to meet this burden.

## VI.

Defendant asserts that section 16–8–107, C.R.S.2007, is unconstitutional as applied because the court permitted the jury to consider, as evidence of guilt, defendant's statements made during court-ordered examinations.

 The interpretation of statutes is a question of law subject to de novo review. *Hendricks v. People,* 10 P.3d 1231, 1235 (Colo.2000). When construing statutes, our primary duty is to give effect to the intent of the General Assembly, looking first to the statute's plain language. *In re 2000–2001 Dist. Grand Jury,* 97 P.3d 921, 924 (Colo. 2004). If a statute is clear and unambiguous on its face, then we need not look beyond the plain language and must apply the statute as written. *Garhart ex rel. Tinsman v. Columbia/HealthONE, L.L.C.,* 95 P.3d 571, 591 (Colo.2004). When a constitutional challenge to a statute is reviewed, constitutionality is presumed and the challenging party bears the burden of establishing unconstitutionality beyond a reasonable doubt. *People v. Baer,* 973 P.2d 1225, 1230 (Colo.1999).

Section 16–8–104.5, C.R.S.2007, the Unitary Trial Procedure Statute, protects a defendant's privilege against self-incrimination through section 16–8–107, which states in pertinent part:

(1)(a) ... [N]o evidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination ... is admissible against the defendant on the issues raised by a plea of not guilty, if the defendant is put to trial on those issues, except to rebut evidence of his or her mental condition introduced by the defendant to show incapacity to form a culpable mental state; and, in such case, that evidence may be considered by the trier of fact only as bearing upon the question of capacity to form a culpable mental state, and the jury, at the request of either party, shall be so instructed.

. . . .

(1.5)(a) ... [E]vidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination ... is admissible only as to the issues raised by the defendant's plea of not guilty by reason of insanity, and the jury, at the request of either party, shall be so instructed. . . .

### A.

 Defendant argues that the trial court erroneously refused to issue a limiting instruction pursuant to subsection (1)(a), rather than (1.5)(a) of section 16–8–107. Specifically, he argues that his privilege against self-incrimination was violated when the trial court did not instruct the jury that it must limit its consideration of the expert testimony to the issue of whether defendant had the capacity to determine right from wrong. We disagree.

In pretrial motions, defendant unsuccessfully challenged the constitutionality of the Unitary Trial Procedure Statute and requested that the trial be bifurcated. In denying the motions, the trial court stated that it would instruct the jury prior to each physician's testimony, "The testimony you are about to hear from Dr. Blank is admissible only on the issue raised by the defendant's plea of not guilty by reason of insanity and may be considered for no other purpose." The trial court stated that it would instruct the jury at the end of each physician's testimony, "You have just heard the testimony from Dr. Blank. It is admissible only on the issue raised by the defendant's plea of not guilty by reason of insanity, and [it] may be considered for no other purpose." The trial court did so with minor, inconsequential variations.

When considering section 16–8–107, a division of our court stated:

[Subsections (1)(a) and (1.5)(a) ] provide essentially the same protection: evidence first acquired from a defendant during court-ordered examinations may only be used at trial to establish the defendant's capacity to form the mental state at issue. While we acknowledge that § 16–8–107(1.5)(a), unlike § 16–8–107(1)(a), does not contain specific language stating that

such evidence may be considered "only as bearing upon the question of capacity to form a culpable mental state," nevertheless, whether the subsection specifically refers to "capacity" is not conclusive. The reference in § 16–8–107(1.5)(a) to issues raised by the insanity plea relates to the defendant's "mental condition," and is, in our view, equivalent to the reference in § 16–8–107(1)(a) to a defendant's "capacity to form a culpable mental state."

To the extent these two subsections could be given an alternative construction, the legislative history supports our interpretation. Section 16–8–107(1)(a) was originally applicable to the former affirmative defense of impaired mental condition. When that defense was incorporated into the insanity defense, see § 16–8–101.3, C.R.S. 2003, testimony before the General Assembly noted that § 16–8–107(1.5)(a) simply restated former law providing that any communications were admissible only as to issues raised by an insanity plea. See Hearings on H.B. 96–1145 before the House and Senate Judiciary Committees, 60th General Assembly, Second Session (Jan. 16 & 24, 1996). So construed, those subsections do not infringe upon the privilege against self-incrimination.

*People v. Herrera*, 87 P.3d 240, 245–46 (Colo. App.2003).

We recognize that the issue in *Herrera* was not insanity but "impaired mental condition." We conclude, however, that the rationale is persuasive here where defendant presented defenses based on both theories. Therefore, we conclude that the trial court's instruction adequately protected defendant's privilege against self-incrimination.

Given our conclusion, we need not address defendant's assertion that the instructions violated his privilege against self-incrimination because they were given pursuant to subsection (1) of section 16–8–107 rather than subsection (1.5).

### B.

■ Defendant next asserts that the affirmative defense instruction impermissibly allowed the jury to consider for the purposes of defendant's guilt all evidence presented. We disagree.

The affirmative defense instruction stated:

The evidence presented in this case has raised an affirmative defense.

The prosecution has the burden of proving the guilt of the defendant to your satisfaction beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged.

After considering the evidence concerning the affirmative defense with all of the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty.

■ Defendant did not object to the jury instruction, and so we review for plain error. *People v. Miller*, 113 P.3d 743, 749 (Colo.2005); *Garcia*, 28 P.3d at 344; *see also* Crim. P. 52(b). "Plain error is error that is so clear-cut, so obvious, a competent trial judge should be able to avoid it without benefit of objection." *People v. Taylor*, 159 P.3d 730, 738 (Colo.App.2006). Plain error requires reversal when the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Walker v. People*, 932 P.2d 303, 311 (Colo.1997).

■ In order to preserve the privilege against self-incrimination, evidence derived from court-ordered sanity examinations may only be used to determine a defendant's capacity to form the requisite mental state. *Herrera*, 87 P.3d at 245; *see also* § 16–8–104.5. Here, defendant argues, and we agree, that the statement, "[a]fter considering the evidence concerning the affirmative defense with all of the other evidence in this case, if you are not convinced beyond a reasonable doubt of the defendant's guilt, you must return a verdict of not guilty," could have indicated to a juror that it was permissible to consider evidence from the insanity defense in conjunction with the determination of defendant's guilt.

However, the propriety of a particular jury instruction should be viewed in the context of the total instructions. *Lybarger*, 807 P.2d at 582. The final limiting instruction stated:

The court admitted certain evidence for a limited purpose. At that time, you were instructed not to consider it for any purpose other than the limited purpose for which it was admitted.

You are again instructed that the testimony of [the physicians] may only be considered regarding the issues raised by the defendant's plea of not guilty by reason of insanity. You may not consider that evidence for any other purpose.

As already noted, the jury was also given similar limiting instructions before and after each physician's testimony.

While the final limiting instruction, without more, is confusing as to whether evidence offered in support of the insanity defense may be considered in conjunction with issues of defendant's guilt, the jury instructions, viewed as a whole, adequately resolve any confusion. Therefore, any error in the final limiting instruction was cured by the surrounding instructions and does not rise to the level of plain error.

### C.

■ Defendant asserts that the trial court erred by rejecting his proffered final limiting instruction. Specifically, he asserts that the final limiting instruction was insufficient because it did not advise the jury that it could consider evidence of defendant's statements made for the first time during court-ordered examinations as they favor the defense for any purpose. We disagree.

Defendant proffered the following final limiting instruction:

You have heard testimony from [the physicians].

This testimony may be used for a limited purpose only.

You may not use this testimony for the purpose of deciding whether the prosecution has met its burden of proof with respect to the affirmative defense of insanity.

You may only use this testimony as it favors the prosecution solely with regard to their obligations regarding the affirmative defense of insanity.

You may use [the physicians'] testimony as it favors the defense for any purpose.

Section 16–8–107(1)(a) states that communication derived from the defendant's mental processes during the course of a court-ordered examination "may be considered by the trier of fact *only* as bearing upon the question of capacity to form a culpable mental state." (Emphasis added.) In addition, section 16–8–107(1.5)(a) states that such evidence "is admissible *only* as to the issues raised by the defendant's plea of not guilty by reason of insanity." (Emphasis added.) Therefore, it is clear that the jury could not use the expert testimony as it favored the defense for any purpose. In addition, the final limiting instruction stated that the physicians' testimony "may only be considered regarding the issues raised by the defendant's plea of not guilty by reason of insanity." As previously described, this instruction properly allowed the jury to consider incapacity to form a culpable mental state as well.

Therefore, we conclude that the trial court did not err in refusing the tendered instruction.

### VII.

■ Defendant asserts that the trial court erroneously instructed the jury regarding the prosecution's burden of disproving his reasonable belief to employ deadly physical force in self-defense. We disagree.

The trial court, over defendant's objection, instructed the jury:

In deciding whether or not the Defendant had reasonable grounds for believing that he was in imminent danger of receiving serious bodily injury, you should determine whether or not he acted as a reasonable and prudent person would have acted under like circumstances. It is not enough that he believed himself in danger, unless the facts and circumstances shown by the evidence and known to him at the time, or by him then believed to be true, are such that you can say that as a reasonable person he had grounds for that belief.

Defendant objected that, without an "apparent necessity" instruction, this instruction did not adequately instruct the jury that it must consider the facts from defendant's standpoint when determining self-defense issues. As defendant objected to the jury

instruction, we review under a harmless error standard. Crim. P. 52(a); *Garcia*, 28 P.3d at 344.

A jury instruction tracking the language of the statute is generally considered to be sufficient. Further, it is unnecessary to give an instruction that is encompassed by other instructions provided by the court. *People v. Garcia*, 1 P.3d 214, 222 (Colo.App.1999), *aff'd*, 28 P.3d 340 (Colo. 2001). Here, a previous jury instruction, stated in relevant part:

> It is an affirmative defense ... that the defendant used deadly physical force because
>
> 1. He reasonably believed a lesser degree of force was inadequate, and
>
> 2. He had reasonable grounds to believe, and did believe, that he was in imminent danger of being killed or of receiving great bodily injury or the other person was committing or reasonably appeared to be committing robbery.

This instruction tracks CJI–Crim. 7:17 (1983), the pattern jury instruction, and conforms to the language of section 18–1–704(2)(a), (c), C.R.S.2007. In addition, it encompassed defendant's tendered "apparent necessity" instruction, and permitted the jury to consider from defendant's viewpoint whether he was justified in using physical force in self-defense. *See Hare v. People*, 800 P.2d 1317, 1319 (Colo.1990). Therefore, we conclude that the trial court did not err in refusing defendant's "apparent necessity" jury instruction.

Given our conclusions, we need not address defendant's assertion that the cumulative effect of the challenged errors mandates reversal because it deprived him of his right to a fair trial.

The judgment is affirmed.

Judge BERNARD and Judge KAPELKE * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and