IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-69,859-01






EX PARTE ANDRE LEE THOMAS, Applicant






ON APPLICATION FOR A WRIT OF HABEAS CORPUS


CAUSE NO. 051858-15-A IN THE 15TH JUDICIAL DISTRICT COURT


FROM GRAYSON COUNTY





 Cochran, J., filed a statement concurring in the Court's Order.



 

 This is an extraordinarily tragic case. I concur in the denial of relief because applicant
has not shown that he is being illegally restrained or that his capital murder conviction or
death sentence was obtained in violation of the constitution. Applicant was well represented
at trial, on appeal, and, most especially, on this writ application. In his writ application, he
raises forty-four potential claims for relief. Those claims have been fully addressed by the
trial judge whose lengthy Findings of Fact and Conclusions of Law are supported by the
record. After reviewing the application, the trial record, the direct appeal, and other
associated materials, I, like the Court, adopt those findings and conclusions. But two of
applicant's groups of claims-claims relating to his insanity defense and incompetency to be
tried-deserve greater explanation.

I.


 Applicant has a severe mental illness. He suffers from psychotic delusions and
perhaps from schizophrenia. (1) He also has a long history of drug and alcohol abuse. Because
of his drug abuse, he was frequently truant, quit school in the ninth grade, and had a series
of juvenile and adult arrests. Dr. Axelrad, called by both the State and defense, testified that
the twenty-one-year-old applicant told him that he had been abusing alcohol since age ten
and marijuana since age thirteen, and, in the month before the murders, had been taking large
doses of Coricidin, a cold medicine, for recreational purposes. (2) 

 Applicant's behavior in the months before the killings became increasingly "bizarre": 
 He put duct tape over his mouth and refused to speak; he talked about how the dollar bill
contains the meaning of life; he stated that he was experiencing deja vu and reliving events
time and again; he had a religious fixation and heard the voice of God. (3) In the weeks before
the murders, applicant was heard by others talking about his auditory and visual
hallucinations of God and demons.

 About twenty days before the killings, he took Coricidin and then tried to commit
suicide by overdosing on other medications. He was taken to the local MHMR facility, but
then walked away before he could be treated. (4) Two days before the killings, he drank vodka
and took about ten Coricidin tablets (5) and then stabbed himself. (6) His mother took him to the
local hospital. (7) But again, applicant left the hospital before he could be committed for
observation or psychiatric treatment. (8) On two occasions in the days before the killings,
applicant was seen by friends to be highly intoxicated; they described him as vomiting,
delirious, incapacitated, and lying on the floor.

 At around 7:00 p.m. on March 26th, just one day after stabbing himself, applicant
went to his estranged wife's apartment where she and her boyfriend, Bryant Hughes, were
listening to religious audiotapes. (9) According to applicant's statement to police, he had come
to believe that God wanted him to kill his wife, Laura, because she was "Jezebel," (10) to kill
his four-year-old son, Andre, Jr., because he was the "Anti-Christ," and to kill his wife's
daughter, thirteen-month old Leyha, because she, too, was evil. That evening, applicant saw
Bryant twisting an extension cord as they listened to the religious tapes, and he thought that
Bryant also wanted to strangle Laura and the children. Applicant wanted to make "the first
move," so he walked into Laura's kitchen to find a knife, but then decided that it was not the
right time. Bryant drove applicant home around 10:00 p.m.

 Applicant reported that the next morning he woke up and heard a voice that he thought
was God telling him that he needed to stab and kill his wife and the children using three
different knives so as not to "cross contaminate" their blood and "allow the demons inside
them to live." He walked over to Laura's apartment. He saw Bryant drive by and wave, so
applicant believed that this was a signal that he was doing "the right thing" by killing his wife
and the children. 

 He burst into the apartment, then stabbed and killed Laura and the two children. He
used a different knife on each one of the victims, and then he carved out the children's hearts
and stuffed them into his pockets. He mistakenly cut out part of Laura's lung, instead of her
heart, and put that into his pocket. He then stabbed himself in the heart which, he thought,
would assure the death of the demons that had inhabited his wife and the children. But he
did not die, so he walked home, changed his clothes, and put the hearts into a paper bag and
threw them in the trash. He walked to his father's house with the intention of calling Laura,
whom he had just killed. He called Laura's parents instead and left a message on their
answering machine:

 Um, Sherry, this is Andre. I need y'alls help, something bad is happening to
me and it keeps happening and I don't know what's going on. I need some
help, I think I'm in hell. I need help. Somebody needs to come and help me. 
I need help bad. I'm desperate. I'm afraid to go to sleep. So when you get
this message, come by the house, please. Hello?

Applicant then walked back to his trailer where his girlfriend, Carmen Hayes, and his cousin,
Isaiah Gibbs, were waiting for him. He told them that he had just killed his wife and the two
children. Ms. Hayes took him to the Sherman Police Department and he told the police what
he had done. After he was hospitalized for his chest wound, he was taken to jail, and he gave
a videotaped statement to the police. In that videotaped statement, applicant gives a very
calm, complete, and coherent account of his activities and his reasons for them. 

 Five days after the killings, applicant was in his cell with his Bible. After reading a
Bible verse to the effect that, "If the right eye offends thee, pluck it out," applicant gouged
out his right eye. (11) Applicant was examined for competency to stand trial by two
psychologists and was evaluated by a treating psychologist in jail, all of whom agreed that
applicant was not then competent to stand trial. (12) All three provided a diagnosis or opinion
of "Schizophreniform Disorder with a Rule out (13) of Substance Induced Psychotic Disorder
due to [applicant's] recent history of abusing Coricidin." 

 After approximately five weeks of treatment and medication in the Vernon State
Hospital, applicant was found to have regained his competency to stand trial. During his stay
at Vernon, applicant was placed on Zyprexa, a strong anti-psychotic medication, and did not
display "bizarre or unusual behaviors," but he did make "hyper-religious statements
throughout his stay." The attending psychiatrist at Vernon updated applicant's diagnosis as
being Substance-Induced Psychosis with Delusions and Hallucinations. He also diagnosed
applicant as malingering (as did a psychologist). 

 Applicant was returned to Grayson County to stand trial. Several different
psychiatrists and psychologists-both for the State and applicant-interviewed and tested
applicant in anticipation for the capital murder trial. By that time, applicant was fully alert,
conversant, and attentive. His memory tested well, he spoke at a level consistent with his
tested I.Q. of 112, and he behaved appropriately during the interviews. He told one
psychiatrist in December 2004 that he had not experienced any hallucinations since
September, although he was severely depressed. 

 At trial, the jury rejected his insanity plea and found applicant guilty of the capital
murder of thirteen-month-old Leyha. Based upon the jury's answers to the special
punishment issues, the trial judge sentenced him to death.

 II.


 In his first twelve claims, applicant complains of the trial court's jury instruction on
the law of voluntary intoxication. He asserts that this instruction should not have been given
and that his trial counsel's failure to object to this instruction showed ineffective assistance
of counsel. (14) He argues that the evidence did not support an instruction on voluntary
intoxication and that the instruction "erroneously suggest[ed] that intoxication precludes an
insanity defense." (15) Applicant's claims that his two trial attorneys were ineffective for failing
to object to the voluntary intoxication instruction are without merit. 

 First, an attorney is not constitutionally ineffective if his conduct was not deficient. (16) 
Here, applicant's counsel properly did not object to the voluntary intoxication instruction
because its submission was, as the trial judge found, supported by the law and the evidence. 
Applicant admitted that he consumed a combination of alcohol, marijuana, and Coricidin
some thirty-six hours before the murders. A toxicologist testified that he still had a trace of
DXM (the active ingredient in Coricidin) in his blood after the murders. Numerous witnesses
testified about applicant's drug use. (17) The State's experts thought that applicant's psychosis
was substance-induced. (18) According to one psychiatrist, there appears to be "a strong
association between [applicant's] drug and alcohol abuse problems and his affective
disfunction" and that applicant's use of Coricidin in the days before the murders accentuated
his mental problems. (19) He concluded, "All of [applicant's] psychiatric problems, which
occurred at the time of the commission of the alleged offenses, are the result of voluntary
intoxication with alcohol, cannabis, and Coricidin[.]"

 This voluntary-intoxication instruction, as the trial court's findings state, "was not
erroneous, misleading or a misstatement of the law." The trial court had included the
instruction pursuant to article 8.04(a) and (d) of the Texas Penal Code. (20) This definition
does not require that the intoxicating substance still be in the body at the time of the offense. 
The State's theory was that applicant's psychosis was caused by, or aggravated by, his
voluntary use of alcohol, drugs, and Coricidin. Accordingly, if applicant's pre-existing,
"weakened" condition of mind was not such as would have rendered him legally insane at
the time of the murders, but his recent use of intoxicants aggravated that "weakened"
condition-was the "last straw" so to speak-then insanity at the time of the offense would not
be a defense. That position is in accord with prior Texas law, (21) as well as law from other
states. (22) This legal proposition was accepted by the trial court, the State, and the defense. 

 The defensive theory, however, was that applicant's actions were committed as the
result of insane delusions caused solely by his mental disease. (23) This is precisely what Dr.
Gripon, the defense expert, stated: Although applicant had previously used drugs and alcohol,
his insanity was not substance-induced. The State's experts, Drs. Scarano and Axelrad,
testified that applicant was psychotic when he committed the offense, but that his psychosis
was triggered by his substance abuse in the preceding days and weeks. It was also their
opinion that applicant knew that his conduct was wrong at the time of the offense. 

 There was ample evidence to reject an insanity defense and support a jury finding that
applicant knew that his conduct was wrong at the time he murdered his wife and the
children. (24)
 There was also evidence that applicant did not know that his conduct was wrong
at the time. This was a quintessential fact issue for the jury to decide, and it did so. (25) Neither
on appeal nor in this habeas application does applicant contend that there was such
"overwhelming evidence" that applicant did not know that what he was doing was wrong as
to make the jury verdict "manifestly unjust." (26) 

 While there is no dispute that applicant was, in laymen's terms, "crazy" at the time he
killed his wife and the children, the legal question is whether he knew that what he was doing
was "wrong" or a "crime" at the time he acted. (27) There is no dispute that applicant knew
that it was his wife and the children that he was stabbing to death. He may have thought that
he was morally justified in doing so because she was a "Jezebel," his son was the "Anti-Christ," and Leyha was somehow evil also. He said, "I thought I was doing the will of
God." (28) But religious fervor, whether the result of a severe mental disease or inspired by a
jihadist fatw or KKK rally, does not provide a legal excuse for the knowingly "wrongful"
murder of a person. 

 Applicant's trial counsel submitted an affidavit stating that it was his understanding
that the submission of an instruction on voluntary intoxication was legally proper under these
circumstances. He is correct. An attorney is not constitutionally deficient when he declines
to make a legally meritless objection. (29) Applicant's ineffective assistance claims are without
merit.

 Nonetheless, this is a particularly tragic case because these horrendous deaths could
have been avoided. Those around applicant realized that he was mentally ill, and he was
twice taken to hospitals to obtain help. In each instance, he left before he could be
involuntarily committed for observation, diagnosis, or treatment. The hospitals cannot be
faulted; they cannot detain someone involuntarily without legal authority, and applicant
voluntarily left while they were trying to obtain that mental health warrant. Of course, there
is no direct relationship between the failure to detain applicant for involuntary mental health
treatment and the deaths of applicant's wife and the two children, while there is a direct
relationship between his intentional conduct and their deaths. The jury was given the proper
instructions, and it was entitled to reject his insanity defense and find him criminally
responsible for that murderous conduct.

III.


 Applicant also claims that (1) he was not competent to stand trial (30) and (2) his trial
attorneys were constitutionally ineffective for failing to request a second competency exam.
Applicant's first claim is procedurally barred, but the need for clarity in the law concerning
ineffective assistance warrants discussion of the second claim. (31)

 At the time of applicant's trial in March 2005, Texas law stated, "A person is
incompetent to stand trial if the person does not have:


 sufficient present ability to consult with the person's lawyer with a reasonable
degree of rational understanding; or
 a rational as well as factual understanding of the proceedings against the
person. (32)


Texas law, in accord with decisions by the United States Supreme Court, (33) has intentionally
set the threshold for competency very low. A person may be suffering from a severe mental
disease or defect or he may be highly medicated, but he will be competent to stand trial if he
still has the ability to meaningfully consult with his attorney and he has a rational as well as
factual understanding of the charged offense and the trial proceedings. (34)

 Applicant was initially found incompetent to stand trial and sent to Vernon State
Hospital on June 23, 2004. While there, he was placed on Zyprexa, a medication used for
the treatment of schizophrenia and related psychotic disorders. After the dosage was
increased to 40 mg a day and applicant was enrolled in a psychosocial educational program
to improve his trial competence, he was found to meet the six criteria for trial competency. (35) 
At Vernon, applicant was diagnosed with Substance-Induced Psychosis with Delusions. He
was also diagnosed with Malingering because he "has clearly exaggerated symptoms that he
might be experiencing, and may have even fabricated some symptoms of psychosis." He was
returned to Grayson County for trial.

 For the first time, applicant argues that the 40 mg dosage of Zyprexa during the trial
exceeded the normal maximum therapeutic amount, and therefore he could have been overly
sedated and unable to consult with his trial counsel. (36) Trial counsel, however, disputes that
conclusion. In his post-trial affidavit, lead counsel stated that he did not file a second claim
of incompetency after applicant returned from Vernon State Hospital because he believed
that applicant was, in fact, competent. Counsel stated that, "[a]lthough [applicant was]
heavily medicated and still suffering from a mental illness, I was able to talk to applicant and
discuss the case with him." Applicant was able to participate in their conversations, he
recalled events, and helped with his defense. 

 When the judge explicitly asked counsel, during the trial, if he was claiming that
applicant was again incompetent, counsel tried to avoid the question, but finally had to admit
that he was not going to challenge applicant's present competency "because [he] had no new
evidence to dispute the findings at Vernon or suggest the applicant was incompetent. 
Although I will work diligently for my clients, I will not lie to the court or file motions, the
basis of which I know are not true." Applicant's lead counsel would usually be the single
most reliable and important source of information about whether he and applicant could 
discuss the factual and legal aspects of the case and develop an appropriate defense. 
Although others who worked with counsel in developing evidence and testimony for the trial
disagreed with counsel's assessment and thought that applicant was not totally responsive
to them during the trial, the trial judge credited counsel's affidavit and found that applicant
was competent to stand trial. (37) 

 Applicant has failed to show that his counsel was constitutionally deficient for failing
to raise a second claim of incompetency to be tried when both his counsel and the trial court
concluded that applicant was competent to stand trial.

 Although reasonable people might well differ on the questions of whether this
applicant was sane at the time he committed these murders or competent at the time he was
tried, those issues were appropriately addressed by the defense, the prosecution, trial judge,
and the jury during the trial. The evidentiary basis for those sanity and competency issues (38)
could have been addressed on direct appeal, thus they are procedurally barred (as well as
without merit). His ineffective assistance claims are, as the trial judge found, without merit.
In sum, applicant has failed to prove that he is entitled to relief on his application for a writ
of habeas corpus. This is a sad case. Applicant is clearly "crazy," but he is also "sane" under
Texas law.

Filed: March 18, 2009


Do Not Publish
1. There is evidence in this habeas record that applicant's entire family had long suffered
from mental illness. For example, his father's affidavit states that applicant's mother, Rochelle,
was mentally ill and that all three of their sons had suffered mental illnesses. One of applicant's
brothers has also been diagnosed as schizophrenic. According to one of applicant's experts,
Rochelle and her family believed that their delusions were "gifts" that made them special. They
interpreted "their mental illness as superior powers" because "God talks to them" and gives them
"visions." 
2. Applicant told one psychologist that he had been using large quantities of Coricidin in
the days and weeks before the murders, and he told another psychologist that he and his girlfriend
ingested up to ten pills a day, mixed with alcohol and marijuana, to obtain "a high." He thought
that Coricidin "brings perspective to the whole world, reality breakthrough drug."
3. According to his friend, Amy Ingle, applicant began acting strangely at least a month
before he began using Coricidin:

 [I]n late January, 2004, he started acting more and more strange. He really went
haywire. Since Andre lost his job and did not have any money. Andre and I and
some of his friends used to play dice in Andre's trailer and bet money on the
game. Once, Andre won a $100 bill and immediately placed it in an ashtray and
lit it on fire, while yelling, "Money is the root of all evil!" He burnt up the entire
$100 bill despite being broke.
4. Apparently, a neighbor's son took applicant to the mental health center. The MHMR
intake sheet reads:

 [Applicant] presented as a walk-in-reportedly told the front desk he would throw
himself in front of a bus if he couldn't talk to someone now. He presented as
restless and highly agitated. He made loose associations & often did not answer
questions directly. He stated "we've been here before & the same shit happened." 
He stated "Life is too much for me to handle. I want to die right now." He stated
if he had a gun he would shoot himself-he asked if triage would shoot him.

The MHMR staff told him to go to the emergency room, but he did not do so. An order for
involuntary commitment was obtained, but it was never implemented.
5. According to one of applicant's experts, "Coricidin has known recreational use for the
effects produced by its main ingredient dextromethorphan. When taken in high doses this drug
produces euphoria and sensory and perceptual changes that typically last about 6-10 hours
depending on the tolerance of the user. Effects may be enhanced or become less predictable
when used in conjunction with other mind altering substances."
6. Applicant explained that he was a "fallen angel" who could "open the gates of Heaven"
by killing himself by stabbing himself in the heart. Although the wound was not life-threatening,
he did not understand why he did not die and therefore concluded that he was "immortal." 
7. The hospital record included the following notations:

 * "[Applicant] has expressed suicidal ideation to several staff in the ER."

 * "Psychotic features."

 * "[Applicant] states he cut on his chest this AM trying to 'cross over into heaven';
[Applicant is] psychotic-thinks something like Holodeck on Star Trek is
happening to him; 'I don't know if I volunteered for this or if I was forced to'
referring to his life."
8. In fact, applicant had twice before been evaluated for psychiatric problems in 2003
when he was in jail charged with stabbing his brother. He was eventually released without
prosecution because he had acted in self-defense.
9. Applicant explained to police that these tapes talked about a "secret God clan" that
would kill, enslave, and rule over people. The audiotape reminded applicant that he had had
similar dreams in which Laura was Jezebel, his son was the Anti-Christ, and Leyha "was
involved with it also." 
10. During one competency interview, applicant said that the reason he and his wife were
separated was because she had had sexual relations with his brother and cousin, but then he said
that he was uncertain whether this was truly the case. Another expert stated that applicant had
periodic "obsessions regarding his estranged wife, Laura, being unfaithful to him by having
sexual relationships with members of his family."
11. Applicant's counsel recently filed a motion to remand his case, pointing out that, while
on death row, applicant also gouged out his left eye and ate it.
12. The experts generally agreed that applicant was able to understand the charge against
him, the facts underlying that charge, and the role of the judge and defense. But applicant's
ability to behave appropriately in the courtroom and to communicate with his attorney were
sufficiently compromised to make him incompetent to stand trial at that particular time. 
13. "Rule out," in this context, is understood to mean "try to eliminate or exclude
something from consideration." 
http://www.medterms.com/script/main/art.asp?articlekey=33831;
http://newideas.net/adhd/diagnosis/what-to-rule-out-first. It does not mean that this possible
alternate diagnosis has already been ruled out. 
14. See Strickland v. Washington, 466 U.S. 668 (1984).
15. These claims are procedurally barred because applicant failed to object at trial or raise
them on direct appeal. Ex parte Boyd, 58 S.W.3d 134, 136 (Tex. Crim. App. 2001); Ex parte
Goodman, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991); Ex parte Banks, 769 S.W.2d 539, 540
(Tex. Crim. App. 1989) (op. on reh'g).
16. Strickland, 466 U.S. at 687 (first prong of ineffective assistance claim is that trial
counsel's performance was deficient in that his performance fell below an objectively reasonable
standard determined by the then-prevailing professional standards); see Ex parte Chandler, 182
S.W.3d 350, 356 (Tex. Crim. App. 2005) ("[A] reasonably competent counsel need not perform a
useless or futile act, such as requesting a jury instruction to which the defendant is not legally
entitled or for which the defendant has not offered legally sufficient evidence to establish.
Requesting a jury instruction to which one is not legally entitled, merely for the sake of making
the request, is not the benchmark for a competent attorney.") (footnote omitted).
17. One nurse testified that applicant told her that if it hadn't been for the drugs, the
murders wouldn't have occurred.
18. Even the defense expert testified that the combined use of marijuana, alcohol, and
DXM would aggravate and exacerbate a pre-existing condition of schizophrenia.
19. Dr. Axelrad noted that applicant "has experienced psychotic behavior and psychotic
symptoms, which appear to be strongly associated with the use of drugs and alcohol since his
early adolescence. He reported to me that he had at least one psychotic episode in 2002, and has
reported similar symptoms of psychotic experiences associated with intoxication on a number of
occasions throughout the course of his development."
20. Article 8.04(a) reads: "Voluntary intoxication does not constitute a defense to the
commission of crime." Section (d) defines "intoxication" to mean "disturbance of mental or
physical capacity resulting from the introduction of any substance into the body."
21. See Evilsizer v. State, 487 S.W.2d 113, 116 (Tex. Crim. App. 1972) ("if the pre-existing condition of mind of the accused is not such as would render him legally insane in and
of itself, then the recent use of intoxicants causing stimulation or aggravation of the pre-existing
condition to the point of insanity cannot be relied upon as a defense to the commission of the
crime itself.").
22. See, e.g., State v. Sexton, 904 A.2d 1092, 1099-1111 (Vt. 2006) (rejecting the claim that
a "defendant can present an insanity defense based on his claim that the ingestion of illegal drugs
activated a latent mental disease or defect resulting in a psychotic reaction that rendered him
unable to appreciate the criminality of his conduct or conform his conduct to the requirements of
the law"; noting, however, that a "defendant remains free to prove that he was not responsible for
his conduct as a result of an independently preexisting mental disease or defect that rendered him
unable to appreciate the criminality of his acts or conform his conduct to the requirements of the
law."); Bieber v. People, 856 P.2d 811, 817 (Colo. 1993) (rejecting defense of "settled" insanity
and finding "no principled basis to distinguish between the short-term and long-term effects of
voluntary intoxication by punishing the first and excusing the second. If anything, the moral
blameworthiness would seem to be even greater with respect to the long-term effects of many,
repeated instances of voluntary intoxication occurring over an extended period of time.")
23. In his most recent affidavit, applicant's lead trial attorneys points out that one
psychiatrist retained by the defense, but not called at trial, "could not rule out the possibility that
the psychotic episode was induced by drugs and alcohol." 
24. That evidence would include:

* Applicant thought about murdering Laura the night before when he thought Bryant might
do so before he could, and he went into the kitchen to look for a knife, but then decided
that the time was "not right";

* Applicant went to Laura's apartment to commit the crime at a time when he knew that
Bryant would not be there;

* He saw Bryant leave before he approached the apartment;

* He admitted that he saw a woman when he was on the way to his wife's apartment, but
decided not to say hello because he wanted things to appear "normal" and not call
attention to himself;


 He took the three knives that he used to kill the victims with him when he left his trailer
and went to Laura's apartment; 
 When Laura came running toward him as he barged into the apartment with the knife
raised, she cried "No," but the only word applicant said was "Yes" as he began stabbing
his wife to death. 


* He felt panicked after he committed the murders;

* He left the apartment when the alarm went off;

* He walked home faster when he heard police and fire sirens because he knew that police
were on the way and that "they'd be on to me in [a] second but they didn't, they didn't
ever catch up to me";

* He left duct tape behind and thought that the police could identify him through
fingerprints left on the tape;

* When he returned home, he told his cousin and girlfriend that he had committed the
murders and that the police would be coming for him;

* He told his cousin that he would not see him for a long time;

* He turned himself in to the police, said that he "murdered" his wife, and asked, "Will I be
forgiven?";

* He told Dr. McGirk that, while he was stabbing Laura, there was a moment when he
asked himself, "What the f___ am I doing?"

25. See Graham v. State, 566 S.W.2d 941, 952-53 (Tex. Crim. App. 1978) (stating that
issue of insanity is not strictly one of a medical fact because it also includes an "inarticulate
ethical component" that is properly left to the jury's discretion).
26. See Bigby v. State, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994) (reviewing the
sufficiency of the evidence that supported the jury's rejection of the defendant's affirmative
defense of insanity in a capital murder trial); Meraz v. State, 785 S.W.2d 146, 155 (Tex. Crim.
App. 1990) (affirming court of appeals' holding that evidence was factually insufficient to
support a finding of competency).
27. See Ruffin v. State, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008) ("Under Texas law,
'wrong' in this context means 'illegal.'"). Of course, the jury is instructed only on whether the
defendant knew that what he was doing was "wrong." See Brown v. State, 122 S.W.3d 794, 802
(Tex. Crim. App. 2003). Jurors may then use their common sense understanding of the word
"wrong" when deliberating upon that issue. Graham v. State, 566 S.W.2d 941, 952-53 & n.1
(Tex. Crim. App. 1978).
28. During the first custodial interview, a detective asked applicant, "For instance, you
knew it wasn't right to go out there and do what you did at that apartment, right?" 

 Applicant responded, "Right, but I felt like it was what God wanted me to do. That's
what he told me to do."

 In response to whether he knew what he did was "wrong," applicant said, "It wasn't on
my mind whether it was right or wrong. I don't like to talk about it because I cared about Laura. 
That was my friend. She was my friend. I didn't want to hurt her. What's happening?" Then
applicant stated that he had stabbed himself and explained, "I wanted to die for my sins."

Applicant said, "I just want to say that I'm sorry for what I did."
29. See Ex parte Chandler, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005).
30. Applicant failed to object at trial that he had not regained his competency during the
time he spent at Vernon Hospital. This claim is procedurally barred. Ex parte Bagley, 509
S.W.2d 332, 334 (Tex. Crim. App. 1974).
31. In this case, the trial court's findings were issued before the direct appeal was
concluded and thus did not address the potential procedural default issue. This ineffective
assistance claim is not barred as procedurally defaulted even though applicant raised the issue of
ineffective assistance of his counsel for failing to request a post-commitment competency hearing
on direct appeal. That claim was rejected on direct appeal, but in this habeas application,
applicant provides additional evidence that could arguably support such a position. See generally
Ex parte Nailor, 149 S.W.3d 125, 131 (Tex. Crim. App. 2004) (procedural bar not applied when
new evidence is brought forward on habeas application to support previously rejected claim of
ineffective assistance of counsel). 
32. Tex. Code Crim. Proc. art. 46B.003.
33. Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam) (the test for determining
competency to stand trial is "'whether [the defendant] has sufficient present ability to consult
with his lawyer with a reasonable degree of rational understanding-and whether he has a rational
as well as factual understanding of the proceedings against him.'"); Drope v. Missouri, 420 U.S.
162, 171 (1975) (repeating Dusky standard and stating that it "has long been accepted that a
person whose mental condition is such that he lacks the capacity to understand the nature and
object of the proceedings against him, to consult with counsel, and to assist in preparing his
defense may not be subjected to a trial.").
34. See, e.g., Townsend v. State, 949 S.W.2d 24, 27 (Tex. App.-San Antonio 1997, no pet.)
(although evidence showed that defendant was depressed and suicidal, a "determination that a
person is mentally ill does not constitute a finding that the person is incompetent to stand trial"; 
evidence supported finding that defendant could consult with his attorney and understood the
proceedings against him).

35. Those criteria are: 

(1) Capacity to understand the charges and potential consequences of pending criminal
proceedings.

 Here, the Vernon psychologist concluded that applicant has "consistently been able to
accurately name the charges he faces, and has periodically indicated his awareness that
this is a serious matter of felony status."

(2) Capacity to disclose pertinent facts, events, and states of mind to counsel.

 The competency report stated that applicant knew his attorney's name, but was not sure if
that attorney was trying to help him because applicant hardly ever saw him. Thus, the
report continued, "one might conclude that his faith in his attorney might well be
increased if and when he has greater contact. Importantly, [applicant] was able to provide
a consistent account of facts, events, and states of mind to various authorities within the
first several weeks after the instant offense, suggesting that should he chose to do so, he
would be able to convey information to his attorney as well."

(3) Capacity to engage in a reasoned choice of legal strategies and options.

 The report noted that applicant was verbally vague on these issues, but that he revealed
considerably greater understanding of such information on a written questionnaire. 
"[H]is approach of grossly exaggerating the symptoms of memory deficits and
[psychosis] that he appears to have adopted during this evaluation can be interpreted as a
distinct strategy, one which he has apparently chosen to pursue."

(4) Capacity to understand the adversarial nature of the legal process.

 The report concluded that applicant had a reasonable understanding of the roles played by
the various courtroom personnel.

(5) Capacity to exhibit appropriate courtroom behavior.

 Applicant knew that he was "supposed to sit still, pay attention" in the courtroom. 
Although he had originally suggested that he would talk directly to the judge "if faced
with a situation in which others were lying about him," applicant then agreed that it
would be more appropriate to use his attorney as a conduit to the judge.


 Capacity to testify.


 The psychologist noted that applicant could provide a consistent account of the events
and circumstances surrounding the charged offenses, [but] he had a very low tone of
voice, a tendency to mumble, and frequently made non-responsive answers. 

This sixth area was the only one of concern to the Vernon psychologist. Nonetheless, both
applicant's treating psychiatrist and the testing psychologist found that applicant "has
demonstrated all areas of trial competency." See Tex. Code Crim. Proc. art. 46.B.024(1).

 
36. The trial court's pertinent factual finding states, "As is widely recognized, antipsychotic
drugs can have a 'sedation-like' effect, and in severe cases, may affect thought processes." 
37. The trial judge could also rely upon his personal recollection of applicant's appearance,
demeanor, and statements during the trial as support for his finding that applicant was competent.
38. A claim of error that the trial judge's failure to make a specific judicial determination
that applicant had regained his competency was raised, but rejected, on appeal.